UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

UNITED STATES OF AMERICA,                    :

              v.                    :          Indictment No.
                                                        09-CR-442 (WHP)

                                               :

YUSUF ABDUR RAHMAN,

                                     :

               Defendant.

                                     :

------------------------------------------------------------------------x

## SENTENCING MEMORANDUM

Stephanie M. Carvlin
Counsel for Yusuf Abdur Rahman
111 Broadway, Suite 701
New York, New York   10006
212-748-1636

## TABLE OF CONTENTS

PRELIMINARY STATEMENT.........................................................................1

THE RELEVANT LEGAL STANDARDS...........................................................1

  1. The Presentence Investigation Report..................................................2

        a. Loss Amount........................................................................3

        b. Ten or More Victims..............................................................7

        c. Charitable Organization Enhancement.......................................9

        d. Use of Sophisticated Means...................................................12

        e. Producing or Trafficking In Unauthorized
           Access Devices...................................................................15

        f. The Appropriate Criminal History Category.............................17

  2. The Nature of the Offense.............................................................20

  3. Mr. Rahman's Background and History..............................................22

        a. [REDACTED]....................................................................22

        b. Mr. Rahman's Background.....................................................25

  4. The Kinds of Sentences Available....................................................27

  5. The Goals of Sentencing...............................................................27

CONCLUSION.....................................................................................29

i

## TABLE OF AUTHORITIES

### Statutes

21 U.S.C. §843(a)(3)..................................................................................2, 20

18 U.S.C. §3553(a)...................................................................................passim

18 U.S.C. §1347.........................................................................................2, 20

18 U.S.C. §1029.......................................................................................15, n5

18 U.S.C. §1029(a)(5)................................................................................2, 20

18 U.S.C. §1029(e)(5).....................................................................................15

18 U.S.C. §1028A..............................................................................3, 15 n5, 20, 27

### United States Sentencing Guidelines Provisions

U.S.S.G. §4A2.1(e)(1)........................................................................18, n7, 19

U.S.S.G. §4A1.3(b)(1).....................................................................................20

U.S.S.G. §4A1.2(a)(2).................................................................................18, 19

U.S.S.G. §3D1.4(c)......................................................................................3, n2

U.S.S.G. §2B1.6..........................................................................15, n6, 16

U.S.S.G. §2B1.1........................................................................................3, 7, 9

U.S.S.G. §2B1.1(b)(2)..................................................................................9, n4

U.S.S.G. §2B1.1(b)(2)(A)..................................................................................3

U.S.S.G. §2B1.1(b)(2)(A)(i)................................................................................7

U.S.S.G. §2B1.1(b)(9)(C)...........................................................................3, 12

U.S.S.G. §2B1.1(b)(8)(A)............................................................................3, 11

U.S.S.G. §2B1.1(b)(10)(B)..........................................................3, 16, 17, 18

U.S.S.G. §2B1.1(b)(10)(B)(i).............................................................................15

U.S.S.G. §1B1.3………………………………………………………………………………17

## Cases

## United States Supreme Court

United States v. Booker
  543 U.S. 220 (2005)…………………………………………………………………1

## United States Circuit Courts of Appeals

United States v. Amico,
  416 F.3d 163 (2d Cir. 2005)……………………………………………………..13

United States v. Brumer,
  528 F.3d 157 (2d Cir. 2008)……………………………………………………21

United States v. Crosby,
  297 F.3d 103 (2d Cir. 2005)……………………………………..…2, 19, n8

United States v. Jackson,
  346 F.3d 22 (2d Cir. 2003)…………………………………………………..13, 14

United States v. Jones,
  551 F.3d 19 (1st Cir. 2008)………………………………………………………16

United States v. Lucien,
  347 F.3d 45 (2d Cir. 2003)……………………………………………………21

United States v. Marcum,
  16 F.3d 599 (4th Cir. 1994)………………………………………………………12

United States v. Ministro-Tapia,
  470 F.3d 137 (2d Cir. 2006)………………………………………………………2

United States v. Regensberg,
  2010 WL 2501042 *1 (2d Cir. June 18, 2010)……………………………..14

United States v. Singh,
  390 F.3d 168 (2d Cir. 2004)……………………………………………………..22

United States v. Smith,
  133 F.3d 737 (10th Cir. 1997)……………………………………………………11

United States v. Sutton,
582 F.3d 781 (7th Cir. 2009)……………………………………………….…..8

United States v. Treadwell,
593 F.3d 990 (9th Cir. 2010)…………………………………………………11

United States v. Wexler,
522 F.3d 194 (2d Cir. 2008)…………………………………………………22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

UNITED STATES OF AMERICA,                    :

             v.                                       :     Indictment No.
                                                       09-CR-442 (WHP)
                                                  :
YUSUF ABDUR RAHMAN,

           Defendant.                             :

                                                  :
-----------------------------------------------------------------x

## PRELIMINARY STATEMENT

Yusuf Abdur Rahman will be sentenced by Your Honor on November 10, 2010. Of course, Mr. Rahman bears the responsibility for his actions. However, he faces sentencing by this Court in large part as a result of long-term drug use that has been exacerbated [**REDACTED**]. While he can exercise poor judgment -- as the Court has witnessed -- Mr. Rahman also is an intelligent, creative man who can be thoughtful and introspective.

I submit this Sentencing Memorandum to object to the Guidelines calculation contained in Presentence Investigation report ("PSR") and to provide information about Mr. Rahman's background that I believe the Court should considering in determining what sentence to impose.

## THE RELEVANT LEGAL STANDARDS

As the Court knows, following the United States Supreme Court's decisions in United States v. Booker, 543 U.S. 220 (2005), and subsequent cases, a sentencing decision must be governed by the factors listed in 18 U.S.C. §3553(a). Those factors include the nature and circumstances of the offense, the

history and characteristics of the defendant, the kinds of sentences available, the Guidelines range and any applicable Guidelines Policy Statements, the need to avoid sentencing disparities and the need to provide restitution to the victim. This Court must consider all of the §3553(a) factors to derive a sentence that is "sufficient, but not greater than necessary," to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public and to provided the defendant with needed educational or vocational training, medical care or other correctional treatment. See United States v. Ministro-Tapia, 470 F.3d 137, 141-43 (2d Cir. 2006) (analyzing the "parsimony clause" of 18 U.S.C. §3553(a)).

### 1. The Presentence Investigation Report

While this Court is no longer bound to impose a Guidelines sentence and the Guidelines range no longer provides the presumptive sentence, the United States Court of Appeals for the Second Circuit has directed District Courts to "consider" the Guidelines, and in "order to fulfill this statutory duty to 'consider' the Guidelines, a sentencing judge will normally have to determine the applicable Guidelines range." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Thus, one step in deciding what sentence is appropriate for Mr. Rahman is to calculate the Guideline range for his offense.

Following a jury trial held before this Court, Mr. Rahman was convicted of Health Care Fraud in violation of 18 U.S.C. §1347, Access-Device Fraud in violation of 18 U.S.C. §1029(a)(5), Obtaining a Controlled Substance by Fraud in violation of 21 U.S.C. §843(a)(3) and Aggravated Identity Theft in violation of 18

2

U.S.C. §1028A.[1] The author of the PSR sets Mr. Rahman's Total Offense Level at 32. (PSR at ¶55.)[2] Probation reaches this number by starting with a Base Offense Level of 6, pursuant to U.S.S.G. §2B1.1,[3] and adding 16 levels for loss exceeding $1,000,000. Eight additional levels are added in the PSR for other Specific Offense Characteristics. The PSR adds two points pursuant to §2B1.1(b)(2)(A) for ten or more victims, two points pursuant to §2B1.1(b)8)(A) for purporting to act on behalf of a charitable organization, two points pursuant to §2B1.1(b)(9)(C) for use of sophisticated means and two points pursuant to §2B1.1(b)(10)(B) for trafficking in unauthorized access devices. (PSR at ¶¶46-51.) Mr. Rahman objects to Probation's calculation of loss and to its application of each of the other offense-characteristics enhancements.

## a. Loss Amount

Probation sets the loss amount at $1,284,000 which yields an increase of 16 levels to the Base Offense Level. (PSR at ¶39.) In support of this figure, Probation states that the FBI, through consultation with the Bureau of Fraud

---

[1] Mr. Rahman continues to press his contention that all counts of the indictment are multiplicitous and, therefore, he can be sentenced only on one count.

[2] Mr. Rahman's Guidelines calculation is driven by his convictions under Counts 1 and 2, which together form one group – Group 1. His conviction under Count 3 (Obtaining a Controlled Substance by Fraud) creates a second group. However, the Guidelines offense level for this group is more than nine levels less serious than the offense level from Group 1 and therefore is disregarded in the Guidelines calculation as directed by U.S.S.G. §3D1.4(c). Mr. Rahman's sentence on Count 4, the Aggravated Identity Theft charge, carries a mandatory consecutive sentence of two years and therefore is not calculated under the Guidelines.

[3] Mr. Rahman asks that I make the Court aware of his *pro se* contention that the appropriate Guideline for calculating his offense level is U.S.S.G. §2F1.1, not U.S.S.G. §2B1.1.

3

Investigations ("BFI") of the New York City Human Resources Administration, learned that Medicaid reimbursed various pharmacies for drugs that Mr. Rahman purportedly obtained improperly. According to Probation, Medicaid reimbursed "Pharmacy 1" $133,000; "Pharmacy 2" $388,000; "Pharmacy 3" $537,000 and ten other pharmacies located in the Bronx, Manhattan, Brooklyn and Queens approximately $226,000 "for prescription drugs purchased by Rahman using the Cardholders' New York State Benefits Identification Cards." (PSR at ¶¶32-37.)

The government's proof at trial demonstrated a much lower loss.

The government's proof of loss came from several sources. BFI investigator Philip Schaffroth testified that prior to arresting Mr. Rahman he met with him on three occasions, including March 20, 2009. During the March 20 meeting investigator Schaffroth showed Mr. Rahman a series of prescriptions that were filled at LaCross and Safeway pharmacies. Mr. Rahman was asked to review the prescriptions and initial any he had submitted. (Trial Transcript "T" at 176-77.) The government introduced a summary chart that incorporated the prescriptions that Mr. Rahman confirmed he was responsible for having filled. The total loss to Medicaid reflected in that chart, Exhibit 401, is $284,288.91. (Government Exhibit 401 attached hereto as Exhibit A.)

The government introduced another summary chart, Exhibit 400. That exhibit listed Medicaid reimbursements for prescriptions the government asserted Mr. Rahman was responsible for having filled at Astoria Chemist, a pharmacy in Queens. The owner of Astoria, Steven Lien, testified that Mr. Rahman, using the name Miguel Goitia, had prescriptions filled there on many occasions. (T82-T84.)

4

According to Mr. Lien, "Mr. Goitia" also filled prescriptions in other names, including Willie Smalls, Jessie Dixon and Michael Pearce. (T104.)

The government sought to demonstrate at trial which of the Medicaid-reimbursed prescriptions that had been filled at Astoria Chemists in various names during the key timeframe should be attributed to Mr. Rahman. Part of the government's proof included testimony that Mr. Rahman obtained prescriptions by presenting a letter to physicians or physicians' assistants that purported to be instructions from the Bureau of Prisons ("BOP") to an HIV positive inmate who had recently been released from prison. The letter advised the individual to continue to take a series of listed drugs -- Trizivir, Norvir, Sustiva, Neupogen, Zyprexa and Valtrex -- that he supposedly had been receiving while incarcerated. (T150.) The government offered testimony through a BOP employee, Walter Obando, that five similar letters in the names of Arnold Warren, Hakim Richardson, Efrain Otero, Wade Loggins and Willie Smalls, which were introduced as government exhibits at trial, did not correspond to individuals who had been incarcerated in federal facilities. The letters were not genuine and had not been generated by the BOP. (T308-T310.)

Special Agent Eugene Hagan of the FBI testified that he participated in the arrest of Mr. Rahman. Bottles of prescription drugs or prescriptions bearing the names Yamilka Monge, Stanley Marshal, Willie Smalls and Miguel Goithia were recovered from Mr. Rahman's person or from his home. (T338, T343, T348-49.) A notebook recovered from Mr. Rahman's home contained the names Wade Loggins, Serge Taluy and Troy Blanding with notations that indicated that

5

prescription drug had been obtained in their names. (T350-T351.) FBI agents also recovered an identification card in the name Gregory Williams that bore Mr. Rahman's picture. (T348.)

Safeway Pharmacy owner Sagnia Balbuena testified that Mr. Rahman, using the name Omar Aziz, filled prescriptions at her pharmacy for "himself" (Aziz) and for Miguel Goithia, Yvonne Baucom, Billy Barnes and Stanley Marshall. (T468-T470. T471, T473.)

The chart designated Government Exhibit 400 (attached hereto as Exhibit B) summarized this evidence. It incorporated Medicaid-reimbursed prescriptions that had been filed at Astoria Chemists in the names that were derived from these sources – the BOP letters (Arnold Warren, Efrain Otero, Wade Loggins and Willie Smalls); the names on the prescriptions, identification card and notebook that were recovered from Mr. Rahman's person or his home (Yamilka Monge, Stanley Marshall, Willie Smalls, Miguel Goithia, Wade Loggins, Serge Taluy, Troy Blanding, Gregory Williams); the names witnesses testified that Mr. Rahman had used to fill prescriptions at other pharmacies (Yvonne Baucom, Billy Barnes), and the names that were on prescriptions that Mr. Rahman acknowledged that he had had filled at LaCross and Safeway (Jesse Dickson, Jose Rosado). Based on these sources, the government asserted that Mr. Rahman was accountable for improper Medicaid reimbursement totaling $504,739.89 being paid to Astoria Chemists. That amount plus the $284,288.91 of Medicaid reimbursement obtain by Safeway and LaCross pharmacies

6

reflected in Exhibit 401 yielded a total of $789,028.80. This was the figure the government adopted at trial.

The $1,284,000 million figure used by Probation apparently was derived from Medicaid claim detail reports (CDRs) run by FIB agent Schaffroth. However, the government conceded at trial that the CDRs included other prescriptions that could not definitively be traced back to Mr. Rahman. The government told the Court that the list generated by the CDRs may have been over inclusive and may have overstated the loss for which Mr. Rahman should be held responsible. (T199, T201-202, T190-208.) Thus, the $1,284,000 million loss reflected in the CDRs is not the number to use in calculating the loss Mr. Rahman should be held responsible for. Rather, the $789,028.80 figure the government adopted at trial should be used. This loss corresponds to an increase of 14, not the 16-level increase adopted in the PSR.

### b.   Ten or More Victims

The PSR proposes a two-level enhancement pursuant to U.S.S.G. §2B1.1(b)(2)(A)(i) "because the offenses in Counts 1 and 2 involved 10 or more victims." (PSR at ¶48.) This Specific Offense Characteristic cannot be applied in this case.

Application Note 1 to U.S.S.G. §2B1.1 defines victim as "(A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense." The actual loss in this case is the money that Medicaid reimbursed the pharmacies for prescriptions that were not eligible for payment by Medicaid There was no

7

evidence that any Medicaid beneficiary suffered any financial loss. Indeed, the only evidence at trial on this point was that the Medicaid beneficiaries permitted Mr. Rahman to use their Medicaid identification numbers in exchange for payment. (T165, T567.) Thus, it is Medicaid and Medicaid alone that was the victim in this case.

In United States v. Sutton, 582 F.3d 781, 785-86 (7th Cir. 2009), the Seventh Circuit ruled on this exact issue. Sutton set up a counseling service that purported to provide psychological counseling to Medicaid recipients but in fact provided no service. Sutton used the Medicaid identification numbers of over 2500 individual Medicaid recipients without their knowledge. He was convicted of health care fraud. At sentencing, the District Court increased Sutton's offense level by six based on the Court's conclusion that the recipients whose identification numbers were used constituted victims within the meaning of U.S.S.G. §2B1.1(b)(2)(C)(if the offense involved 250 of more victims, increase by 6 levels). The Circuit Court reversed on this point, relying on the Application Notes' definition of victim as "any person who sustained any part of the actual loss." The beneficiaries whose numbers were used suffered no economic loss and, therefore, the District Court erred in increasing Sutton's offense level under U.S.S.G. §2B1.1(b)(2)(A).

8

Admittedly, the Seventh Circuit's holding is not binding on this Court. However, the Circuit Court ruled correctly.[4] Medicaid is the sole victim. This enhancement may not be imposed.

### c.   Charitable Organization Enhancement

Section 2B1.1(b)(8)(A) of the United States Sentencing Guidelines requires a two-level increase in a defendant's Base Offense Level if his conduct involved "a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency." The PSR's calculation of Mr. Rahman's Total Offense Level includes this enhancement. (PSR at ¶49.) It should not.

This Specific Offense Characteristic applies "in any case in which the defendant represented that the defendant was acting to obtain a benefit on behalf of a charitable ... organization ... (regardless of whether the defendant actually was associated with the organization ...) when, in fact, the defendant intended to divert all or part of that benefits (e.g. for the defendant's personal gain)." Application Note 7(B) to U.S.S.G. §2B1.1. The Application Note gives examples of the type of conduct that merits application of the enhancement:

(i)   a defendant who solicited contributions for a non-existent famine relief organization.

---

[4]Count Two charged Unauthorized Use of an Access Device and Count Four charged Mr. Rahman with Aggravated Identity Theft. Certainly people whose identity is stolen or whose access devices are used fraudulently could be considered victims under U.S.S.G. §2B1.1(b)(2) in the appropriate circumstances. For example, victims of identity theft suffer an actual loss if their credit card numbers are stolen and used to make purchases. However, the beneficiaries in this case do not meet the Guidelines definition of victim – one who suffered an economic loss.

9

(ii)     A defendant who solicited donations from church members by falsely claiming to be a fundraiser for a religiously affiliated school.

(iii)    A defendant, chief of a local fire department, who conducted a public fundraiser representing that the purpose of the fundraiser was to procure sufficient funds for a new fire engine when, in fact, the defendant intended to divert some of the funds for the defendant's personal benefit.

Mr. Rahman's conduct does not fall within the purview of the enhancement. At trial individuals associated with three pharmacies provided the testimony on which Probation apparently bases this enhancement. Sagnia Balbuena from Safeway Pharmacy testified that Mr. Rahman, calling himself Omar Aziz, told her that he worked at a shelter and that he was assigned by the site director to pick up and drop off the prescriptions for some of the residents. (T469.) Jay Fishman, who worked at LaCross Pharmacy during the relevant time frame, testified that "a large black man" came in to the pharmacy 15-20 times to pick up prescriptions. The man said he was a manager of an AIDS hospice in the neighborhood. (T408, T409.) Mr. Fishman did not identify Mr. Rahman. Steven Lien, the owner of Astoria Chemists, testified that Mr. Rahman, using the name Miguel Goithia, brought in prescriptions from other individuals he said were living with him. (T84.)

This testimony does not support this enhancement. The Background section of §2B1.1 explicitly states that the enhancement is targeted at punishing "the particular social harm" that is created when defendants "take advantage of victims' charitable motives" or "exploit victims charitable impulses." United States Sentencing Guidelines Manual, 2009 Ed. at 99. This review of the testimony

10

demonstrates that Mr. Rahman did not entice (or attempt to entice) the pharmacists' to give him the medications for free or at a discounted rate by preying on their humanitarian instincts to help the homeless or those suffering from AIDS, the conduct that is covered by U.S.S.G. §2B1.1(b)(8)(A).

The cases in which the various Circuit Courts of Appeals have found that this enhancement should be applied illustrate this distinction. In United States v. Smith, 133 F.3d 737, 741 (10th Cir. 1997), the Tenth Circuit approved the use of the enhancement in circumstances in which the defendant had obtained contributions as a telephone solicitor for a non-existent organization that he falsely claimed was devoted to helping children stay off drugs. In United States v. Treadwell, 593 F.3d 990, 1007 (9th Cir. 2010), the Ninth Circuit upheld the application of the enhancement where co-conspirators solicited money from investors by claiming that a certain percentage of the gains from the investments would "be returned to humanitarian needs" and by extolling the benefits of seeing the investments benefit the hungry throughout the world. The Fourth Circuit in United States v. Marcum, 16 F.3d 599, 603 (4th Cir. 1994), found that the District Court had properly applied the enhancement to a defendant who had skimmed proceeds from bingo games that were conducted on behalf of a local charitable organization.

Nothing equivalent happened in this case. The pharmacists and Mr. Rahman engaged in a business transaction. He presented prescriptions to the pharmacists. They filled them, charged Medicaid the normal price and collected

11

their reimbursement from Medicaid. Probation erred in including this enhancement.

### d.   Use of Sophisticated Means

Probation suggests in the PSR that the Court increase Mr. Rahman's offense level by two under U.S.S.G. §2B1.1(b)(9)(C) because "the offense involved sophisticated means." (PSR at ¶50.) Application Note 8(B) to U.S.S.G. §2B1.1(b) defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." The Application Note gives examples of the type of conduct that would merit this increase. "[I]n a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction" would constitute sophisticated means. In addition, conduct "such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."

The evidence at trial demonstrated that Mr. Rahman paid a number of Medicaid beneficiaries $10 to $20 to let him use their Medicaid identification numbers. (T165.) Using the names of the various beneficiaries whose identification numbers he had obtained, Mr. Rahman fabricated letters on his computer that purported to be from the BOP. As described above, the letters listed medications that recently discharged "inmates", – the Medicaid beneficiaries whose numbers Mr. Rahman had – were supposedly being instructed to continue to take upon their discharge from federal prison. Mr.

12

Rahman pretended to be the different individual named in the letters and gave them to medical personnel to obtain prescriptions. (T138.) He presented those prescriptions to Astoria Chemists, Safeway Pharmacy and LaCross Pharmacy to be filled. (T138.) While this scheme involved a number of steps, the offense was not "especially complex or especially intricate." In fact, the conduct involved nothing more than a home computer and a talent for impersonation.

The Second Circuit has often interpreted this Guideline provision and a review of some of the cases demonstrates the type of conduct that generally if found to triggers this enhancement. In United States v. Amico, 416 F.3d 163 (2d Cir. 2005), the defendant participated in a scheme through which false information was used to obtain mortgages. On appeal, he challenged the imposition of the sophisticated means adjustment. The Second Circuit affirmed the District Court, relying on the fact that the conspirators had created false bank documents, solicited and created false appraisals, created false blueprints and submitted them to town officials and colluded with the attorneys who represented the buyers at the closing.

In United States v. Jackson, 346 F.3d 22 (2d Cir. 2003), the defendant's conduct involved stealing a victim's identity and using the stolen identities to purchase precious goods like diamonds. In his plea allocution, Jackson described a typical scheme, which began with searching the internet for a wealthy target. Once he located a target, Jackson purchased personal information about the person from an "information broker." With that information, Jackson placed calls to banks, credit card companies and hotels to convince the

13

representative of the organization that he was the individual whose identity he had stolen. Through these calls he obtained additional private information about the victim, including account numbers and credit card expiration dates. He then increased the credit limits on the victim's accounts and changed the billing address to a hotel. He used hotels in several different states for these purposes. Armed with the information and the increased spending limits, Jackson ordered goods and had them shipped to the hotels where courier services or hotel employees accepted delivery. Posing as the victim, Jackson picked up the items and sold them for cash. The District Court imposed a sophisticated-means enhancement. The Second Circuit rejected Jackson's argument that sophisticated means had to include the use of special technology or offshore bank accounts or something similar. Each step of a scheme need not be elaborate, the Court held, as long as the scheme as a whole is sophisticated vis-à-vis the typical offense conduct. Jackson, 346 F.3d at 25, citing United States v. Lewis, 93 F.3d 1075, 1083 (2d Cir. 1996)(holding in tax case that sophisticated means enhancement applied; even though each step in the planned tax evasion was simple, view together the steps comprised a plan more complex than merely filling out a false tax return). See also United States v. Regensberg, 2010 WL 2501042 *1 (2d Cir. June 18, 2010)(Summary Order)(enhancement appropriate where scheme involved the creation of fraudulent loan documents, detailed reporting of fake earnings, use of Ponzi scheme payments to lull investors and alteration of account statements to hide loss of investors' money).

14

Mr. Rahman's conduct does not meet this standard.

### e.   Producing or Trafficking in Unauthorized Access Devices

Finally, Probation assesses Mr. Rahman two points pursuant to U.S.S.G. §2B1.1(b)(10)(B)(i), which increases the offense level for defendants who were involved in producing or trafficking in access devices. Producing is defined in Application Note 9(A) to include "manufacture, design, alteration, authentication, duplication, or assembly." Trafficking is not defined in this Guideline. However, traffic is defined in 18 U.S.C. §1029(e)(5) to mean "transfer, or otherwise dispose or, to another, or obtain control of with intent to transfer or dispose of."

There was no evidence that Mr. Rahman trafficked in access devices.[5] He did not sell, pass on, share or otherwise transfer the beneficiaries' Medicaid identification numbers. Nor was there any indication that he intended do so. The evidence at trial demonstrated that he used the numbers to "pay" for the prescriptions he obtained.

Additionally, because this Court will impose a sentence on Mr. Rahman for Aggravated Identity Theft, a trafficking enhancement may not be applied. Application Note 2[6] to U.S.S.G. §2B1.6, the section that governs sentencing for

---

[5]Mr. Rahman continues to press his argument that a Medicaid beneficiary number does not constitute an access device within the meaning of 18 U.S.C. §1028A and §1029, and, therefore, he was not properly convicted under Count Two or Four. If, as Mr. Rahman contents, a Medicaid beneficiary number does not constitute an access device, then a fortiori this enhancement may not be applied.

[6]Application Note 2 to U.S.S.G. §2B1.6 provides in pertinent part as follows: "Inapplicability of Chapter Two Enhancements -- If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for the transfer, possession, or use

15

Aggravated Identity Theft, prohibits the court from both sentencing a defendant for Aggravated Identity Theft and also enhancing his sentence under the "trafficking" component of §2B1.1(b)(10)(B). See United States v. Lyons, 556 F.3d 703, 708 (8th Cir. 2009); United States v. Jones, 551 F.3d 19, 25 (1st Cir. 2008). Thus, any trafficking in access devices that Mr. Rahman purportedly engaged in may not form the basis for an enhancement under §2B1.1(b)(10)(B).

The First Circuit in Jones, 551 F.3d at 25, found that Application Note 2 does not prevent a court from applying the §2B1.1(b)(10)(B) enhancement for "producing" access devices. This Court should reject that reasoning. Admittedly, Application Note 2 to U.S.S.G. §2B1.6 does not explicitly refer to the production prong of §2B1.1(b)(10)(B). Application Note 2 explicitly directs a court that is sentencing a defendant for Aggravated Identity Theft in addition to Access Device Fraud not to apply "any specific offense characteristic for the transfer, possession, or use of a means of identification when determining the sentence for the underlying offense", here Access Device Fraud. (Emphasis added.) However, Application Note 2 indicates that imposing a §2B1.1(b)(10)(B) enhancement on a defendant who faces a mandatory consecutive two-year sentence for Aggravated Identity Theft would constitute a type of double counting: a "sentence under this guideline [for Aggravated Identity Theft] accounts for this factor for the underlying offense of conviction, including any enhancement that would apply based on conduct for which the defendant is

___

of a means of identification when determining the sentence for the underlying offense."

16

accountable under §1B1.3 (Relevant Conduct)." This Court should not increase Mr. Rahman's offense level under §2B1.1(b)(10)(B).

Additionally, there is an insufficient factual basis for concluding that Mr. Rahman had been engaged in the production of access devices. The only evidence that could even arguably support this enhancement was Exhibit 33 and the related testimony from FBI Special Agent Eugene Hagan. Special Agent Hagan testified that when Mr. Rahman was arrested on March 30, 2009, he had a Medicaid beneficiary identification card in the name of Gregory Williams. (T348.) This card, which Mr. Rahman retained, was introduced into evidence as Government Exhibit 33. Circumstantial proof that Mr. Rahman altered or manufactured one beneficiary identification card or is responsible for someone else having done so should not give rise to a two-level enhancement under this section. The phrase "producing access devices," as used in §2B1.1(b)(10)(B) connotes ongoing activity. A single act of producing a single access device that is intended solely for use by the individual who created or altered it does not meet this definition.

### f. The Appropriate Criminal History Category

Probation calculates that Mr. Rahman has 14 Criminal History Category points, derived as follows: three points for sentences of 10 years' imprisonment imposed by the state of South Carolina on March 7, 1988; three points for sentences of imprisonment of seven years imposed by the state of South Carolina on April 25, 1988; three points for sentences of imprisonment of 18 months imposed by the state of South Carolina on March 9, 1988; three points

17

for a sentence of imprisonment of 33 months imposed on November 2, 2006, by the United States District Court for the District of South Carolina, and two points because Mr. Rahman committed the instant offense less than two years after his release from custody on a prior sentence. (PSR at ¶¶72-82.) In light of the 14-point total this calculation generates, Probation concludes that Mr. Rahman falls within CHC VI. (PSR at ¶82.) The Court should reject this determination on several grounds.[7]

First, the PSR incorrectly states that Mr. Rahman's 18-month sentences for forgery were imposed on March 9, 1988. In fact, Mr. Rahman was sentenced on these convictions on March 7, 1988, the same day he was sentenced to ten-year terms on his convictions for receiving stolen goods, as the Commitment generated by the Clerk of the Bamberg County South Carolina Court of General Sessions documents. (Bates stamp 909, attached hereto as Exhibit C.) Guidelines §4A1.2(a)(2) directs a court to count prior sentences separately unless "(B) the sentences were imposed on the same day." Since Mr. Rahman's ten year sentences for receiving stolen goods and his 18-month sentences for

_____

[7] Mr. Rahman *pro se* asserts that none of his state convictions should be counted because the sentences were imposed more than 15 years prior to the commencement of the instant offense. It is Mr. Rahman's position, which he has asked me to express to the Court, that the tolling provision of U.S.S.G. §4A2.1(e)(1) applies only to violent felony offenses. All other offense may not be counted if they occurred 15 years or more before commencement of the instant offense, regardless of whether the defendant was incarcerated during some portion of the 15-year period.

forgery were imposed on the same day, they count as a single sentence and generate a total of 3, not 6 points.[8] Thus, Mr. Rahman has 11, not 14 CHC point.

Additionally, as of November 1, 2010, subsection (e) of U.S.S.G. §4A1.1, which now require a Court to add two points to a defendant's Criminal History Category ("CHC") if the defendant committed the offense fewer than two years after release from imprisonment, will be deleted. Thus, by the time Mr. Rahman is sentenced, these two points will not longer be added to his CHC.

With the benefit of the Guidelines amendment, Mr. Rahman's correct CHC point total will be nine, not 14 (three for the March 7, 1988, South Carolina state convictions, which yielded sentences in excess of one year and one month; three for the March 25, 1988, South Carolina state convictions for which he received sentences in excess of one year and one month and three for his 2005 Federal Conviction in the District of South Carolina for which he received sentences in excess of one year and one month). (U.S.S.G. §§4A1.1(a); 4A1.2(e).) A total of nine points places Mr. Rahman in CHC IV.

Mr. Rahman also asks that this Court depart to CHC III. The United States Sentencing Commission has explicitly recognized that the point system the Guidelines mandate for determining Criminal History Categories may generate results that are not appropriate. A rigid application of the Guidelines formula may create situations in which court concludes that a defendant's "criminal history category substantially over-represents the seriousness of a defendant's criminal

_____

[8]Of course, the Guidelines range is no longer binding on this Court. Nevertheless, a Court generally must calculate the "correct" Guidelines range as one step in determining what sentence to impose. Crosby, 397 F.3d at 111.

history or the likelihood that the defendant will commit other crimes." U.S.S.G. §4A1.3(b)(1). This Court could reach that conclusion in this case. Six of Mr. Rahman's nine CHC points result from sentences imposed 22 years ago, in 1988. Mr. Rahman's 1988 convictions -- of which there admittedly were many, many -- were for non-violent property crimes (forging checks and receiving stolen property). The sentences were imposed little more than two weeks apart (March 7 and 25, 1998) in resolution of charges that arose from an essentially uninterrupted spree of minor property crimes Mr. Rahman committed to obtain small amount of money to feed his crack addiction.

A Total Offense Level of 20 (6 Base Offense Level plus a 14-level enhancement for a loss of more than $400,000 and less $1,000,000), at CHC III corresponds to a Guidelines range of be 41-51 months. At CHC IV, Mr. Rahman's Guidelines Range would be 51-63 months. Mr. Rahman also faces a mandatory two-year sentence on his conviction of Aggravated Identity Theft in violation of 18 U.S.C. §1028A. This sentence must run consecutively to any other term of incarceration this Court imposes.

## 2. The Nature of the Offense

Mr. Rahman stands convicted of four offenses. Following a jury trial held before this Court, he was found guilty of Health Care Fraud in violation of 18 U.S.C. §1347, Access-Device Fraud in violation of 18 U.S.C. §1029(a)(5), Obtaining a Controlled Substance by Fraud in violation of 21 U.S.C. §843(a)(3) and Aggravated Identity Theft in violation of 18 U.S.C. §1028A. Having presided over the trial, this Court is well aware of the nature of the offenses. Mr. Rahman

paid Medicaid beneficiaries to use their Medicaid identification numbers to obtain prescriptions that he then sold.

Admittedly, these are serious offenses. Medicaid was defrauded of in excess of $700,000. The government spent additional money investigating and prosecuting the case. However, it is also important to consider what the offense conduct did not entail. Mr. Rahman was not involved in introducing adulterated drugs into the market. He did not engage in acts of violence. Additionally, when he was confronted by investigators from BFI, Mr. Rahman cooperated. He did not flee from prosecution. In fact, he met with Investigator Schaffroth on four occasions – March 5, 6, 20 and 30, 2009. From the first meeting forward, Mr. Rahman admitted what he had done. He outlined in detail how he obtained the prescriptions. In the March 20 meeting, he reviewed and signed the prescriptions that were presented to him. Indeed, during his testimony at trial Mr. Rahman did not deny that he committed the crimes.

Another significant aspect of the offense is that Mr. Rahman is not the paradigmatic defendant in a Medicaid-fraud prosecution – a doctor, a pharmacist, a hospital or another type of health-care provider. This does not exculpate Mr. Rahman from responsibility for the crimes he committed. United States v. Lucien, 347 F.3d 45 (2d Cir. 2003). It does mean, however, that he stands in a far different position from those entities and individuals who, unlike Mr. Rahman, receive benefits (patients, guaranteed payment of pre-determined fees) in exchange for voluntarily participating in Medicaid or a similar program. See e.g. United States v. Brumer, 528 F.3d 157 (2d Cir. 2008); (United States v. Wexler,

21

522 F.3d 194 (2d Cir. 2008)(dermatologist convicted of health-care fraud based on submission of bills to insurance companies for payment for procedures he had not performed); United States v. Singh, 390 F.3d 168 (2d Cir. 2004)(physician engaged in fraudulent billing scheme whereby claims were submitted to health care benefits programs for reimbursement with incorrect description of services provided). As a result, those individuals owe a particular duty of loyalty and honesty and, therefore, their conduct is more blameworthy. Mr. Rahman should not face the same sentence as those who defendants who occupied an almost fiduciary relationship with a health care program.

## 3. Mr. Rahman's Background and History[9]

### a. [REDACTED]

[REDACTED]

---

[9]The information in this section comes in part from interviews with Mr. Rahman. Where noted, the information has been verified by other sources.

[REDACTED]

[REDACTED]

## **Mr. Rahman's Family History**

Mr. Rahman was born and raised in Bamberg, South Carolina. His

relationship with his father was tumultuous. Mr. Rahman reports that both he and

his mother were abused by his father and that father, **[REDACTED]**. (PSR at

¶86.) Nevertheless, Mr. Rahman remains in contact with his parents. Indeed, his

mother has written a letter to this court. She describes her son as unusually kind

and good hearted:

Yusuf is a very kind person. He loves people & animals. He will
do any one a favor, go out of his way, has a good heart. He will
give someone his last money out of his pocket, give someone
else good advise, where to go to get help. I have seem him give
someone his coat off his back and the shoes off his feet.

(Letter of Frances Presley to the Court, attached hereto as Exhibit E.)

A number of other people comment on Mr. Rahman's generosity in letters

to the Court. His friend, Lille Mae Lincoln, who has known Mr. Rahman his entire

life, reports that he always gave her "a helping hand" any time she needed it:

Sometimes I didn't even have to ask he would come and say
Mrs. Lillie you need me to do anything for you.

(Letter of Lillie Mae Lincoln to the Court, attached hereto as Exhibit F.) Clay

Lincoln describes a situation where he was broke and Mr. Rahman gave him

$200. (Letter of Clay Lincoln to the Court, attached hereto as Exhibit G.) Howard

Lincoln notes that when he was laid off, Mr. Rahman came to him with a "arm full

25

of food. And then turned around and put kerosene in my house." (Letter of Howard Lincoln to the Court, attached hereto as Exhibit H.)

Virtually all Mr. Rahman's family and friends describe in the same manner. His brother Gaines Presley states that "there is a lot of good in Yusuf and 'much' 'much' more goodness for him to give out." (Letter of Gaines Presley to the Court, attached hereto as Exhibit I.) Gaines describes a situation in which Yusuf profoundly affected his life:

> If it wasn't for Yusuf I wouldn't be the man I am today. Yusuf talked me out of something a long time ago, which turn my whole life around. From this day on I will always remember and than him for.

(Id.)

Mr. Rahman's paternal uncle, Wesley Banks, describes Yusuf similarly as a "giving, caring, loving and kid person" who is "very respectful person and especially to elderly people." (Letter of Wesley Banks to the Court, attached hereto as Exhibit J.) His aunt, Idella Lausen, also describes him the same way – as a loving man who would do anything to help others. (Letter of Idella Lausen to the Court, attached hereto as Exhibit K.)

Mr. Rahman is also the father of seven children. He reports that he remains close to his children, writing and calling them when he is able. A number of the individuals who have written letters to the Court on Mr. Rahman's behalf also comment on his parenting. Lillie Lincoln states that Mr. Rahman "loves his kids unconditionally." (Exhibit F.) His mother notes that he gets along well with his children. (Exhibit E.) Clay Lincoln describes seeing Mr. Rahman in Brooklyn when Mr. Rahman was on his way to take his children to the doctor. (Exhibit G.)

26

Mr. Rahman also has held lawful employment during his life time. He is particularly proud of having worked for Peter Farkas at 800 Branded, a company that manufactures leather clothing. Mr. Rahman sold 800 Branded products to Burlington Coat Factory. He also designed his own coats, which he hoped to have Mr. Farkas manufacture for him. (Photographs of coat designs, attached as Exhibit L, attached hereto.)

## 4.    The Kinds of Sentences Available

Section 3553(a) requires the Court to consider the kinds of sentences available. Mr. Rahman faces a mandatory minimum term of incarceration of two years on his conviction for Aggravated Identity Theft under 18 U.S.C. §1028A. This sentence must run consecutively to any other term of incarceration this Court imposes. However, Mr. Rahman's other convictions do not carry minimum terms of incarceration.[10]  Thus, this Court may impose any term of incarceration on those convictions up to the statutory maxima or no term of incarceration at all.

## 5.    The Goals of Sentencing

Ultimately, this Court must craft a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, protect the public, promote respect for the law, serve as an adequate deterrence and provide the defendant with needed educational or vocational training, medical

---

[10]The maximum term of incarceration on Mr. Rahman's conviction for Health Care Fraud is ten years. He faces a maximum term of 15 years on the Access Device Fraud charge and seven years on his conviction of Obtaining a Prescription by Fraud. In addition, Mr. Rahman may be required to be on supervised release for up to 3 years.

care or other correctional treatment. None of these goals requires imposing a Guidelines sentence in this case.

Of course, Mr. Rahman must be sentenced to a term of incarceration of two years on his conviction for Aggravated Identity Theft. A longer term of incarceration is not necessary in this case.

## [REDACTED]

Thus, two of the goal of sentencing -- providing Mr. Rahman with needed medical care and other correctional treatment – can best be met outside a prison environment by imposing a three-year term of supervised release with a requirement that Mr. Rahman obtain residential treatment for his drug addiction.

This type of sentence would also be consistent with the trend of Guidelines sentencing. As of November 1, 2010, the United States Sentence Guidelines will be amended to reflect a new emphasis on treatment as an alternative to incarceration in certain cases. The amendment was prompted by the Sentencing Commission's multi-year study of alternatives to incarceration. "The Commission initiated this study in recognition of the increased interest in alternatives to incarceration by all three branches of the government and

28

renewed public debate about the size of the prison population and the need for greater availability of alternatives to incarceration for certain nonviolent first offenders." Statement of Reasons for Amendment; Nov. 1, 2010 Proposed Amendments to the United States Sentencing Guidelines. The amendment expands Zones B and C of the Sentencing Table by one level each "and addresses cases in which a departure from imprisonment to an alternative to incarceration (such as intermittent confinement, community confinement, or home confinement) may be appropriate to accomplish a specific treatment purpose." Id.

While Mr. Rahman's Guidelines range does not fall within Zone B or C, a sentence that is crafted toward curing Mr. Rahman's drug addiction while attending to his medical needs would be consistent with 18 U.S.C. §3553(a)'s requirement that a sentencing court consider a defendant's need for needed educational or vocational training, medical care or other correctional treatment.

## CONCLUSION

For the reasons outlined above, it is respectfully submitted that the two-year mandatory sentence Mr. Rahman must serve on his conviction for Aggravated Identity Theft under Count Four is a term of incarceration that is sufficient but not greater than necessary to reflect the seriousness of the offense, protect the public, promote respect for the law and serve as an adequate deterrence. A three-year term of supervised release with a special condition that immediately upon his release from prison Mr. Rahman enter and complete a residential drug treatment program is the sentence that will best provide Mr.

Rahman with needed medical care and other correctional treatment. When Mr. Rahman finished his sentence for Aggravated Identity Theft, he will have been drug-free for almost two years. It will serve him best -- it will serve society best -- if he is able to capitalize on that period of sobriety and solidify it by entering and completing a residential drug treatment program.

Respectfully submitted,

_____
Stephanie M. Carvlin

cc: AUSA Rachael Kovner