UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

       -v.-                                :    09 Cr. 442 (WHP)

YUSUF ABDUR RAHMAN,                          :
    a/k/a "John Fitzgerald Presley,"
    a/k/a "Jamal Smalls,"                   :

             Defendant.                 :

- - - - - - - - - - - - - - - - - - - - x


### SENTENCING MEMORANDUM ON BEHALF OF THE UNITED STATES


PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007


RACHEL P. KOVNER
Assistant United States Attorney
    -Of Counsel-

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :      SENTENCING
                                           MEMORANDUM
        -v.-                         :
                                           09 Cr. 442 (WHP)
YUSUF ABDUR RAHMAN,                  :
        a/k/a "John Fitzgerald Presley,"
        a/k/a "Jamal Smalls,"        :

               Defendant.            :

- - - - - - - - - - - - - - - - - - - - x
```

**INTRODUCTION**

The Government respectfully submits this memorandum to set forth the Government's position in advance of sentencing scheduled for November 10, 2010.  The range of imprisonment recommended under the U.S. Sentencing Guidelines (U.S.S.G. or the "Guidelines") based on the defendant's offense level and criminal history is 92 to 115 months' imprisonment on Counts One to Three of the Indictment, followed by a 24 month sentence on Count Four of the Indictment.  A sentence within the Guidelines range is sufficient but not greater than necessary to serve the objectives of sentencing, in light of the defendant's career of increasingly serious criminality and in light of the manner in which his most recent crimes harmed institutions designed to protect the neediest citizens.

**FACTUAL BACKGROUND**

**A.   The Defendant's Criminal History**

Since even before Yusuf Abdur Rahman became an adult, his life has been marked principally by a series of crimes of escalating seriousness.  According to the defendant, the longest period of legal employment he has had was a job he held at age 17 for approximately one year.  (PSR ¶ 119).

Since that job at 17, Rahman has had 11 adult criminal convictions.  (PSR ¶ 73).  In 1988, at age 23, the defendant was convicted of receiving stolen goods and of forgery in Bamberg County, South Carolina.  (PSR  ¶¶ 74-75, 78; Def't Mem. Ex. C).  He was convicted in Orangeburg County, South Carolina, of 17 additional counts of forgery.  (PSR ¶ 76).

Rahman was sentenced to ten years' imprisonment for receiving stolen goods and to 18 months of consecutive imprisonment for forgery in the Orangeburg County case.  (PSR ¶¶ 74; 78).  He was also sentenced to 7 years' imprisonment on each count in the Bamberg County case, to run consecutive to the Orangeburg County term.  (PSR ¶ 76).

While imprisoned, the defendant escaped custody, and was not apprehended for two years, when he was arrested in New York.  (PSR ¶ 75).  After being returned to South Carolina custody, the defendant was released from prison in 1998 to a term of parole

2

lasting until 2007.  (PSR ¶ 75).

In 2003 and 2004, while on parole from his South Carolina cases, the defendant carried out a prescription drug diversion scheme that was troublingly similar to the defendant's most recent fraud.  (PSR ¶ 80; see Gov't Ex. A).  As a prosecutor summarized it at the time of the defendant's guilty plea to conspiracy to possess with intent to distribute Oxycodone in the District of South Carolina, from November 2003 until April 2004, the defendant "participated in a conspiracy to obtain and distribute Oxycontin."  (Gov't Ex. A at 26).  The prosecutor described:

> The way that they did was, they forged prescription forms that had a doctor's name at the top.  They put Medicaid recipients' names on those forms, and they submitted them to local pharmacies.
> The names that they put on these forms were those of Medicaid recipients.  And these recipients were recruited, they were paid between $20 and $10 to be able to use their names and their Medicaid numbers to obtain these drugs.
> Once these prescriptions were submitted to pharmacies, and there were approximately 10 pharmacies ... Anyway, they did obtain these drugs.  ... And then these drugs were distributed through Bamberg, and also in New York.

(Gov't Ex. A at 26-27).  Rahman agreed with the prosecutor's summary of the offense, except for the statement that the drugs were distributed in New York.  (Gov't Ex. A at 29).

The defendant received a sentence of 63 months' imprisonment

3

for the fraud, which was later reduced to 33 months'
imprisonment.  (PSR ¶ 80).  He began a term of supervised release
in November 2006.  (PSR ¶ 80).

In July 2007, the defendant's supervised release was revoked
and he was sentenced to six months' imprisonment, with 49 days
credited to the six month term because the defendant had
overstayed his original federal sentence.  (PSR ¶ 80).  As a
result, the defendant would have been again released from
incarceration on or about November 30, 2007.

### B.   The Present Offense

Within six months of his release from custody, the defendant
began a new prescription drug fraud scheme.  (See, e.g., Def't
Ex. A at 1 (summary chart identifying prescriptions filled by the
defendant dating back to April 2008)).  The evidence at trial
established that the defendant's scheme worked as follows.
First, Rahman would obtain Medicaid cards, or copies of the
cards, from "people on the street with drug problems and
Medicaid."  (Tr. at 150).  Then, Rahman went to doctors in South
Carolina, New Jersey, Pennsylvania, and New York, where he
impersonated the Medicaid clients.  (See, e.g., Tr. at 145-150).
In order to persuade doctors to prescribe Rahman the expensive
drugs he wanted for resale, Rahman forged letters purporting to
be from the Bureau of Prisons concerning Medicaid recipients

4

whose identities he was using, indicating that the person named
in the letter had recently been released from prison and needed
the specified medications. (See, e.g., Tr. 183-184).  In some
cases, doctors presented with this letter prescribed Rahman the
drugs he requested.  (See, e.g., Tr. 238-241 (testimony of Dr.
Walter McCray)).  In other cases, Rahman altered prescriptions he
had obtained on prior occasions, creating new prescriptions for
the medications he wanted.  (See, e.g., Tr. 461-465 (testimony of
Dr. Jin Suh)).

Rahman would bring the prescriptions, in bulk, to pharmacies
that would provide him with the drugs at Medicaid's expense.  To
explain the large quantities of prescriptions he was bringing to
the pharmacies, Rahman falsely told one pharmacist that he
"worked at a shelter and that he was assigned by the site
director to pick up and drop off the prescriptions for some of
the residents." (Tr. 469).  He told another pharmacist that he
lived in a shelter and was dropping off prescriptions for other
residents.  (Tr. 84).  He told a third that he "was the manager
of an AIDS hospice in the neighborhood." (Tr. 409).  The drugs
that Rahman obtained at Medicaid's expense in 2008 and 2009 from
these three pharmacies were worth more than $700,000.  (See Tr.
505-506; Def't Mem. Ex. 1 and Ex. 2).

### C.   Court Proceedings

5

On March 27, 2009, Rahman was charged in a complaint with health care fraud, access device fraud, and aggravated identity theft.  He was arrested on March 30, 2010.  On April 28, 2009, a grand jury in the Southern District of New York returned a four-count indictment against Rahman.  Count One charged the defendant with executing and attempting to execute a scheme to defraud a health care benefit program by obtaining Medicaid benefits to which he was not entitled, in violation of Title 18, United States Code, Sections 1347 and 2.  Count Two charged the defendant with committing access device fraud by obtaining and using New York State Benefit Identification Cards issued to others in order to fraudulently obtain more than $1,000 in Medicaid benefits.  Count Three charged the defendant with acquiring the controlled substances oxycodone and hydromorphone through fraud, forgery, deception, and subterfuge.  Finally, Count Four charged the defendant with committing aggravated identity theft by knowingly possessing and using without lawful authority the means of identification of others as parts of the crimes charged in Counts One and Two.

On October 13, 2009, Rahman filed a motion seeking, <u>inter alia</u>, to suppress statements he had made to law enforcement officers who interviewed him about his prescription drug fraud. In support of his motion, Rahman submitted a sworn affidavit to

the Court stating that he had been coerced into giving statements to investigators because he had been promised he would not be prosecuted for his crimes.  Rahman stated:

> [E]ach and every time agents secured the statements from me I was in custody.  While in custody I was promised that I would not be prosecuted but that the agents needed to take the statements from me in furtherance of my cooperation with the agents. . . I was promised immunity from prosecution each and every time and those promises were inducement for the statements.

(Rahman Aff. ¶ 3).

The Court held a suppression hearing on the defendant's motion on December 16, 2009.  The Government called three law enforcement officers to testify concerning the circumstances under which the defendant gave his statements.  The agents testified that the defendant was on no occasion promised immunity from prosecution.  The defendant testified at the suppression hearing.  He stated, among other things, that on each of the three occasions that he was interviewed by agents prior to arrest, the agents explicitly promised him that they would not arrest him. (Tr. 106, 108, 113-114, 126, 134, 135, 137, 140, 141).  On December 23, 2009, the Court denied the defendant's suppression motion, stating that the testimony of the three law enforcement agents who testified that they had not promised the defendant immunity from arrest had been "credible and

7

compelling."  (Order of December 23, 2009).

A jury trial began on January 4, 2010.  On January 11, 2010, the jury returned a verdict of guilty as to each count of the Indictment.  Scheduling is scheduled for November 10, 2010.

### D.   The Sentencing Guidelines

#### 1. <u>Criminal History</u>

The Government agrees with the defendant's submission that the defendant falls into Criminal History Category IV under the Guidelines.  The defendant receives three criminal history points for the ten-year sentence he received on March 7, 1988, for receiving stolen goods. (PSR ¶ 74).  In addition, he receives three criminal history points for the seven years of imprisonment, consecutive to the March 7 sentence, that he received for 17 counts of forgery in a different court that year. (PSR ¶ 75). Finally, the defendant receives three criminal history points for 39 months of imprisonment he served following his plea in 2005 to a drug conspiracy charge.  (PSR ¶ 80).

The Government agrees with the defendant's submission that the defendant does not receive additional points for other Orangeburg County convictions or for the recency of his most recent criminal conviction.  The Presentence Investigation Report initially awarded the defendant three criminal history points for

additional forgery convictions in South Carolina, for which the Presentence Investigation Report stated the defendant was sentenced on March 9, 1988.  (PSR ¶ 78).  However, because the defendant appears to have been sentenced for these crimes on March 7, 1998 — the date he was sentenced for his stolen property crimes — the convictions do not yield additional criminal history points.  See Def't Mem. at Ex. C.

In addition, because amendments recently eliminated the enhancement for offenses committed less than two years after release from prison, the two-point enhancement applied to the defendant based on recency does not apply.  (PSR ¶ 82). Accordingly, the defendant has nine criminal history points, and falls in Criminal History Category IV.

A downward departure is unwarranted.  Rahman's criminal history score of nine places him at the very top of Criminal History Category IV.  This classification may well *under*represent Rahman's criminal history category for several reasons.  First, in addition to the offenses described above, Rahman has been arrested and convicted of other crimes more than half a dozen times. (See PSR ¶ 73).  A defendant for whom so many criminal convictions are completely disregarded in calculations is not a defendant whose criminal history categorization overrepresents his criminal history.

9

Second, due to a quirk of sentencing, Rahman escapes Criminal History Category V only because he violated the terms of his supervised release.  In November 2006, Rahman was released from his sentence of incarceration for his drug conspiracy conviction and began a three-year term of supervised release. (PSR ¶ 80).  That term was scheduled to expire in November 2009 – more than a year after the defendant began his instant offense. As a result, if the defendant's term of supervised release had expired in the ordinary course, the defendant would receive two additional criminal history points for having committed the instant offense while on supervised release.  See U.S.S.G. § 4A1.1(d).  The defendant does not receive these additional points only because he violated the terms of his release and, in July 2007, was sentenced to six months' imprisonment for his violations.  (PSR ¶ 80).  The sentencing judge does not appear to have reimposed supervised release.  A defendant who falls in Criminal History Category IV only by benefitting from his own misconduct in this manner should not receive a downward departure.

Indeed, the defendant's significant misconduct during his incarceration and immediately afterward itself provides a reason why a downward departure is unwarranted.  In addition to violating the conditions of his supervised release almost

10

immediately after he was released from incarceration on his last conviction, the defendant escaped following his convictions in South Carolina state court, and was apprehended only two years later. (PSR ¶ 75).  This crime of escape, and the defendant's violation of supervised release, constitute additional criminal conduct that is not reflected in the defendant's criminal history score.  In light of this conduct, a downward departure is unwarranted.


     2.  <u>Offense Level</u>

     A.  <u>Base Offense Level and Loss Enhancement</u>

The Government agrees with defense counsel that the defendant's base offense level, adjusted for loss amount, is 20. Under U.S.S.G. § 2B1.1, the base offense level for Count One and Count Two of the Indictment is 6.  The Government agrees with the defendant's submission that the loss amount is properly increased by only 14 points pursuant to 2B1.1(b)(1)(H).  While federal investigators calculated the loss to Medicaid from the defendant's scheme to be at least $1,284,000, at trial, the Government called witnesses from only three pharmacies where prescriptions had been filled, and proved only losses resulting from prescriptions that the defendant filled from those pharmacies. (<u>See</u> Def't Ex. A; Def't Ex. B).  The loss due to

11

prescriptions filled at those pharmacies was in excess of $700,000 but less than $1,000,000.  As a result, the appropriate loss-based enhancement is 14.

B.  Charitable Organization Enhancement

As set forth in the PSR, the defendant's offense level is increased by two points pursuant to U.S.S.G. § 2B1.1(b)(8)(A) because the defendant falsely represented himself to be acting on behalf of a charitable organization.  This enhancement applies when "the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency." U.S.S.G. § 2B1.1(b)(8).  Here, Rahman represented himself as acting on behalf of a homeless shelter, in one case, and an AIDS hospice, in another, in order to persuade pharmacy employees to fill large quantities of prescriptions for expensive drugs in other people's names. (Tr. 469; Tr. 409).  Because the defendant falsely represented himself to be acting on behalf of a charitable organization in order to execute fraud, two points are added pursuant to U.S.S.G. § 2B1.1(b)(8)(A).

The defendant's submission contends that this provision does not apply to Rahman because "Mr. Rahman did not entice (or attempt to entice) the pharmacists[] to give him the medications for free or at a discounted rate by preying on their humanitarian

12

instincts to help the homeless or those suffering from AIDS." Def't Mem. at 11. To support a limited reading of the provision, Rahman's submission cites cases in which the enhancement *has* been applied to defendants who fraudulently obtained funds by claiming that the money would be used for charitable purposes. Def't Mem. at 11. In addition, the submission quotes an application note whose examples involve defendants who obtained funds through false claims that the funds would go to charity.

The defendant's limited reading of the enhancement is contrary to the great weight of authority and the Guidelines' plain language. <u>United States</u> v. <u>Lambert</u>, 498 F.3d 963 (9th Cir. 2007), is instructive. The defendant in that case contended, like Rahman, that the charity enhancement did not apply unless "the defendant's misrepresentation exploits the generosity, charitable motives, or trusting impulses of the victim." <u>Id.</u> at 968. <u>Lambert</u> surveyed the case law, and found this limitation had been rejected by the Third, Fourth, Sixth, and Seventh Circuits. <u>Ibid.</u> (citing <u>United States</u> v. <u>Bennett</u>, 161 F.3d 171, 191-92 (3d Cir.1998); <u>United States</u> v. <u>Aramony</u>, 166 F.3d 655, 664 (4th Cir.1999); <u>United States</u> v. <u>Wiant</u>, 314 F.3d 826, 829 (6th Cir.2003); <u>United States</u> v. <u>Ferrera</u>, 107 F.3d 537, 542 (7th Cir.1997)). The only contrary authority <u>Lambert</u> found was <u>United States</u> v. <u>Frazier</u>, 53 F.3d 1105 1108-1109 (10th Cir. 1995), which

13

endorsed a limited reading of the enhancement in dicta.  The
Fifth Circuit has since found <u>Lambert</u> persuasive and followed its
approach.  <u>United States</u> v. <u>Reasor</u>, 541 F.3d 366 (5th Cir. 2008).

Indeed, as the Ninth Circuit noted, the Second Circuit case
to touch on this issue seemed to "support[] broader applicability
of the enhancement" than to just defendants who in fact "exploit
victims' charitable impulses or trust in Government."  <u>Lambert</u>,
498 F.3d at 968 n.4.  As <u>Lambert</u> noted, the Second Circuit
concluded in its case on the topic that "the enhancement applied
to the defendants' student loan fraud on the federal government,
holding:  "We see no persuasive reason to look beyond [the
Guideline's] plain meaning, nor do we think the [Guideline's]
supporting materials ... counsel a different result."  <u>Id.</u>
(citing <u>United States</u> v. <u>Berger</u>, 224 F.3d 107, 120-21 (2d Cir.
2000).

Both the Guidelines' text and common sense support the
approach of these courts.  First, "the plain language of the
[enhancement]... contains no textual support" for a limitation of
its application to cases in which a defendant falsely claims to
be raising money for charity to exploit charitable impulses.
<u>Wiant</u>, 314 F.3d at 829.  While the defendant's submission is
correct that the three examples of the enhancement's application
in the Guidelines involve defendants exploiting charitable

interests to raise money, "[t]he examples listed in the application notes are obviously illustrative not exhaustive, and thus provide no mandate for limiting the scope of the enhancement's actual language." Id. Indeed, the language of the commentary makes this illustrative nature clear, providing, "Subsection (b)(8)(A) applies, for example, to the following." U.S.S.G. § 2B1.1, comment. n. 7 (emphasis added).

This conclusion comports with common sense. A defendant who falsely claims to be acting on behalf of a charitable organization exploits the trust that our society places in representatives of charitable organizations, in service of fraud. This is a reprehensible act regardless of whether the defendant's fraud involves exploiting these impulses to get a monetary benefit from the person to whom he made the misrepresentations, or exploiting these impulses so that he can ultimately enrich himself from a different source. This case is illustrative: While the defendant did not obtain a monetary benefit from the pockets of the pharmacists, he used pharmacists' trust in representatives of a charitable institutions to work a massive fraud on Medicaid. That the defendant abused the trust that is ordinarily placed in charities as part of a complex multi-step fraud, rather than a single-step plea for funds, does not make his conduct less culpable.

C.   <u>Sophisticated Means Enhancement</u>

The Presentence Investigation Report correctly added two points to the defendant's offense level pursuant to U.S.S.G. § 2B1.1(b)(9)(C), because the defendant's conduct involved sophisticated means. "'[S]ophisticated means' means especially complex or intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, comment. n. 8(B). The Second Circuit addressed the meaning of this enhancement in <u>United States</u> v. <u>Jackson</u>, where it affirmed the enhancement's application to a defendant in a credit card scheme. 346 F.3d 22 (2d Cir. 2003). The defendant would first identify wealthy targets through Internet searches; then purchase information from an Internet broker about his targets; make phone calls to banks and credit card companies to obtain more personal information; and, after changing their credit card billing addresses, would order merchandise to a hotel, where he would have another person — like a hotel employee — take delivery. <u>Id.</u> The Second Circuit rejected the defendant's argument that "the specific acts of his criminal activity, while admittedly fraudulent, were each individually no more intricate than 'a game of Three-Card Monte.'" <u>Id.</u> at 25. It wrote: "even if each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together so

16

that Jackson could perceive and exploit different vulnerabilities in different systems in a coordinated way." Id.  It also cited a tax fraud case concluding that the enhancement applied even when "each step in the planned tax evasion was simple, [because] when viewed together, the steps comprised a plan more complex than merely filling out a false tax return." United States v. Lewis, 93 F.3d 1075, 1083 (2d Cir.1996).

The defendant's Medicaid fraud was a carefully orchestrated, multi-stage crime that meets the definition of using "sophisticated means" under Jackson and Lewis.  In the first stage, the defendant obtained insurance cards from "people on the street with drug problems and Medicaid" — people whose identities he could use but who were unlikely to report the defendant.  (Tr. at 150).  Next, the defendant forged documentation — Bureau of Prisons letters realistic enough to fool physician after physician into giving the defendant the drugs he identified by name in his forged letters.  Third, using the identities he borrowed and the fake letters, the defendant traveling from state to state and doctor to doctor – visiting doctors in South Carolina, New Jersey, Pennsylvania, and New York – to avoid detection.  (See, e.g., Tr. at 145-150).  Fourth, he presented the prescriptions he received to a series of pharmacies, concocting another fraudulent story to persuade the pharmacists

to dispense large quantities of expensive drugs in numerous other patients' names.  Last, he approached buyers on the prescription drug black market and converted the medications that he had acquired into cash.

Rahman's design and execution of his scheme readily qualifies as "especially complex [and] intricate." U.S.S.G. § 2B1.1, comment. n. 8(B).  The fraud, which involved travel between different jurisdictions among many other steps, is at least as sophisticated as "locating the main office of [a] scheme in one jurisdiction and locating soliciting operations in another jurisdiction" – one of the examples of sophistication in the Guidelines' Application Notes.  See U.S.S.G. § 2B1.1, comment. n. 8(B).  The conduct fits the Jackson paradigm of sophisticated means like a glove.  That is, "even if each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together so that [Rahman] could perceive and exploit different vulnerabilities in different systems in a coordinated way."  Jackson, 346 F.3d at 25.

    D.   Obstruction of Justice Enhancement

    The defendant should also receive the two-level upward adjustment required for a defendant "who willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution,

or sentencing of the instant offense of conviction, and . . . the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. This adjustment applies when a defendant has provided "materially false information to a judge or magistrate." Id. comment. n. 3(f). Information is "material" when, "if believed, [it] would tend to influence or affect the issue under determination." Id. comment. n.6.

Before imposing an obstruction enhancement, "the district court must find that the defendant 'consciously act[ed] with the purpose of obstructing justice.'" United States v. Lincecum, 220 F.3d 77, 80 (2d Cir. 2000) (quoting United States v. Case, 180 F.3d 464, 467 (2d Cir. 1999)) (internal quotation marks omitted). "The court must 'make independent findings necessary to establish a willful' attempt to obstruct justice, but it is sufficient if the court makes a finding that 'encompasses all of the factual predicates for a finding of perjury.'" Id. (quoting United States v. Dunnigan, 507 U.S. 87, 95 (1993)). In other words, the court must "find that the defendant (1) wilfully (2) and materially (3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." United States v. Zagari, 111 F.3d 307, 329 (2d Cir. 1997). However, where the district court finds that the defendant "has

19

clearly lied" in a statement made "under oath," the "court need
do nothing more to satisfy [United States v. Dunnigan, 507 U.S.
87 (1993)] than point to the obvious lie and find that the
defendant knowingly made a false statement on a material matter."
United States v. Williams, 79 F.3d 334, 337-38 (2d Cir. 1996).
Once a district court finds that a defendant committed perjury,
the two-point upward adjustment is mandatory.  See United States
v. Ortiz, 251 F.3d 305, 305-06 (2d Cir. 2001); United States v.
Ruggiero, 100 F.3d 284, 293-94 (2d Cir. 1996).

The obstruction of justice enhancement applies to Rahman
because Rahman lied at a hearing and then at trial in an effort
to persuade the court to suppress, and jurors to discredit, the
confessions that were perhaps the most damning evidence against
him.  Rahman falsely claimed, over and over, that law enforcement
agents had promised him on each occasion they met with him that
he would not be prosecuted if he told them about his crimes.
(See, e.g., Supp. Tr. 105; 112; 114-115; 126; 128; 132; 134; 135;
136; 140).  Rahman repeated his testimony at trial.  (See, e.g.,
Tr. 533; Tr. 536; Tr. 540-541; Tr. 542).  Rahman's account was
directly contradicted by the testimony of the three officers who
were present when Rahman made his confessions. Each testified as
to the confession or confessions for which the officer was
present that no promises were made to Rahman concerning future

20

arrest or prosecution — testimony that, the Court noted in denying the defendant's suppression motion, was credible and compelling." (See Supp. Tr. at 17, 23, 30, 63 (Philip Schaffroth); Supp Tr. at 73, 77 (Vincent Chan); Supp. Tr. at 98-99 (Brian Murphy)).  Because the defendant committed perjury in an effort to suppress and discredit critical evidence against him, the obstruction of justice enhancement applies.

   E.   <u>Enhancements for Multiple Victims and for Production or Trafficking in Unauthorized Counterfeit Access Devices</u>

   The Government agrees with defense counsel that two other enhancements for which Rahman was awarded points in the Presentence Investigation Report do not apply to him.  The enhancement for defendants whose conduct involves ten or more victims does not apply to Rahman because Medicaid was the only institution that sustained financial loss in connection with the scheme.  See U.S.S.G. § 2B1.1(b)(2)(A); U.S.S.G. § 2B1.1 comment. n. 1.  While the Guidelines' definition of victim also includes "any individual whose means of identification was used unlawfully or without authority," U.S.S.G. § 2B1.1, comment. n. 4(E) (emphasis added), because the defendant was convicted of aggravated identity theft, the multi-victim enhancement is not properly applied to the defendant because it would amount to an increase in his offense level based on a "specific offense characteristic for the transfer, possession, or use of a means of

21

identification."   U.S.S.G. § 2B1.6, comment. n. 2.   Such enhancements are unwarranted for defendants who have also been convicted of aggravated identity theft and will serve a separate sentence on that count.   Id.

For similar reasons, the Government does not seek the two-point enhancement for production or trafficking in unauthorized counterfeit access devices set forth at U.S.S.G. § 2B1.1(b)(10)(B).   Increasing the defendant's offense level based on transfer, possession, or use of a means of identification is unwarranted under U.S.S.G. 2B1.6, comment. n. 2, and the Government does not contend the evidence at trial established the defendant was engaged in the production of access devices.

F.   Offense Level and Guidelines Range

In accordance with the above, the defendant's offense level is 26.   At Criminal History Category IV, the defendant's Guidelines Range is 92 to 115 months' imprisonment, to be followed by 24 months' imprisonment for the defendant's aggravated identity theft conviction.

## DISCUSSION

A sentence within the Guidelines Range is sufficient but not greater than necessary to serve the purposes of sentencing.   The defendant's immediate recidivism following his release from custody, the manner in which his scheme took advantage of

society's efforts to help its most vulnerable citizens, and the extent of the loss caused by his scheme all demonstrate that a within-Guidelines sentence is necessary "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2).

First, the defendant's return to crime almost immediately after serving a substantial prison sentence for a virtually identical fraud makes a within-Guidelines sentence appropriate to deter the defendant, protect the public from the defendant, and promote respect for the law.  The defendant has been convicted of criminal offenses on at least 11 occasions. (PSR ¶ 119).  He has received significant sentences: 10 years' imprisonment, 7 years' imprisonment; and a 63-month term that was later reduced to 33 months. (PSR ¶¶ 74, 76, 80).  None of those sentences deterred the defendant from committing further crimes almost immediately after release.

Most recently, the defendant began the fraud scheme of which he was convicted before Your Honor within six months of his release from a substantial term of federal incarceration for committing essentially the same fraud on a slightly smaller scale.  In the defendant's South Carolina fraud, he obtained

23

expensive prescription medications by recruiting Medicaid
recipients, paying them to use their names and Medicaid numbers,
and then submitting fraudulent prescriptions to pharmacies.
(Gov't Ex. A at 26-27).  Rahman would then resell the drugs he
obtained using Medicaid funds.  (Gov't Ex. A at 26-27).

Rahman's prior sentence of 33 months' imprisonment, followed
by additional incarceration for a supervised release violation,
did so little to deter his criminal conduct that he was back
committing the same offense within six months of his release.
This time, Rahman's methods had become slightly more
sophisticated:  In addition to forging prescriptions outright, he
impersonated patients to obtain legitimate prescriptions.  He
sought a broader group of expensive medications.  And he caused a
far greater loss to the Medicaid program.  As a result of the
inadequacy of significant prior sentences to deter Rahman's
criminal activity generally, and the inadequacy of a substantial
sentence for a variation on the instant scheme to prevent Rahman
from re-offending almost immediately, a within-Guidelines
sentence is appropriate to serve the aims of deterrence,
protecting the public, and promoting respect for the law.

A within-Guidelines sentence is also appropriate because the
defendant abused critical trusts to commit his crimes and caused
significant losses to programs designed to help the most

vulnerable.  Rahman preyed on the trust between patients and
doctors, who wrote Rahman prescriptions because they believed
that they were helping a needy patient.  After that, he preyed on
the trust of pharmacists, who believed they were assisting an
employee of a shelter or hospice, again exploiting for his
personal gain the most generous impulses of others.  Finally, and
perhaps most critically, Rahman preyed on the trust of a
government program that provides provide extremely expensive
medications to its neediest citizens free of charge, and caused
more than $700,000 in losses to the program.  Thus, while Rahman
was not, as his sentencing submission notes, a doctor,
pharmacist, or health-care provider, Def't Mem. at 21, he
operated a fraud designed to abuse relationships of trust through
which our society provides care for the needy, and did
substantial harm not to a for-profit entity but to a program
designed to help society's most vulnerable.  "[T]o reflect the
seriousness of the offense, to promote respect for the law, and
to provide just punishment" for this offense,  18 U.S.C. §
3553(a)(2), a within-Guidelines sentence is warranted.

The considerations put forth in the defendant's submission
do not warrant an out-of-Guidelines sentence when weighed against
the gravity of the offense conduct and the failure of prior
sentences to deter the defendant.  Most particularly, the
ingenious, carefully constructed nature of the fraud, as well as
multiple prior evaluations of the defendant, see PSR ¶¶ 102-104,

make clear that the defendant appreciated the wrongfulness of his actions.  Almost immediately after release from a lengthy prison sentence, he constructed a fraud that preyed on institutions designed to help the sick and the needy, and caused those institutions substantial harm.  For the reasons set forth above, the Government seeks a within-Guidelines sentence.

**CONCLUSION**

The Government respectfully submits that a sentence within the defendant's advisory Guidelines range of 92 to 115 months, to be followed by a 24-month sentence for aggravated identity theft, is sufficient but not greater than necessary to serve the legitimate objectives of sentencing.

Dated: November 3, 2010
       New York, NY

                         Respectfully submitted,

                         PREET BHARARA
                         United States Attorney

            By:   _____/s/_____
                         RACHEL P. KOVNER
                         Assistant United States Attorney
                         Tel: (212) 637-2470
                         Fax: (212) 637-2387

CC:  Stephanie M. Carvlin, Esq. (By ECF)