UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

YUSUF ABDUR-RAHMAN,

                                :

                Petitioner,

                                :        09 Cr. 442 (WHP)

       - v. -

                                :

UNITED STATES OF AMERICA,

                                :

                Respondent.

                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO YUSUF ABDUR-RAHMAN'S MOTION
## <u>TO VACATE, SET ASIDE, OR CORRECT HIS SENTENCES</u>


                                    PREET BHARARA
                                    United States Attorney for the
                                    Southern District of New York
                                    Attorney for the United States of America

Michael D. Lockard
Assistant United States Attorney
    - of counsel -

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to Yusuf Abdur-Rahman's motion to vacate, set aside, or correct his sentence.  In motion papers dated November 13, 2013 (the "November Motion") and February 20, 2014 (the "February Motion"), Abdur Rahman claims he was denied his right to self-representation in connection with his trial for defrauding Medicaid, access device fraud, and related health care fraud.  For the reasons discussed below, whether Abdur Rahman's claim is treated as a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure or as a petition pursuant to Title 28, United States Code, Section 2255, the claim is (1) untimely, (2) waived, and (3) incorrect on the merits. Rahman's motion should be denied.

## STATEMENT OF FACTS

### A.      The Charges

On March 30, 2009, Yusuf Abdur Rahman was arrested on charges that he had defrauded Medicaid of hundreds of thousands of dollars through a sophisticated prescription drug fraud scheme. As charged in a criminal complaint, for several months Abdur Rahman impersonated Medicaid beneficiaries at doctors' offices in New York, New Jersey, Pennsylvania, and South Carolina. He borrowed Medicaid identification cards from program beneficiaries to obtain prescriptions for drugs in the beneficiaries' names. For his scheme to succeed, Abdur Rahman used forged letters falsely stating that the cardholder in question had been released from prison and needed the drugs that Abdur Rahman sought. Once he received the prescription, he filled it at pharmacies in Queens and the Bronx using the same Medicaid cards or identification numbers. He later sold these prescription drugs in Manhattan.

On April 28, 2009, an indictment, 09 Cr. 442 (WHP) (the "Indictment"), was returned charging Abdur Rahman in four counts. The Indictment charged Abdur Rahman with executing

and attempting to execute a scheme to defraud Medicaid, in violation of Title 18, United States Code, Sections 1347 and 2; access device fraud, in violation of Title 18, United States Code, Sections 1029(a)(5) and (2); acquiring and obtaining controlled substances by misrepresentation, fraud, forgery, deception, and subterfuge, in violation of Title 21, United States Code, Sections 843(a)(3); and aggravated identity theft by transferring, possessing, and using the means of identification of others during and in relation to the health care fraud charged in Count One and the access device fraud charged in Count Two, all in violation of Title 18, United States Code, Sections 1028A and 2.

**B.     Pretrial Proceedings**

**1.     Abdur Rahman Replaces His First Attorney**

Prior to Abdur Rahman's first appearance, Abdur Rahman's first attorney, Martin Cohen, Esq., of the Federal Defenders of New York, had advised the Court that the defendant had expressed a desire for a new attorney. When Abdur Rahman first appeared on May 5, 2009, however, Mr. Cohen reported that the situation had changed. The Court sought to ascertain Abdur Rahman's preferences directly.

| | |
|---|---|
| Mr. Cohen: | I provided that information to the Court's deputy based on some dis- cussions that I had with Mr. Abdur Rahman. But, from subsequent discussions, it appears that, at least for now, Mr. Abdur Rahman wishes to keep Federal Defenders as his counsel. |
| | Is that correct? |
| Defendant: | Yes. |
| The Court: | Why don't you stand up. |
| Defendant: | Yes, your Honor. Judge Pauley, sir, if it so please the Court. I was — it was in reference to the government allegation that I was a potential flight risk because the NCIC report does not disclose a 1988 escape attempt from South Carolina incarceration which was dismissed and expunged. But somehow or another they allegedly went to contact the department of corrections and due to their |

> insubordination and arbitration towards the courts came up with
> this information. And they decided to use that after almost 21
> years to now justify their reason that I'm a potential flight risk.
>
> And also the issue about the Medicaid recipients, they mention in
> their complaint that I paid them 10 to $20 allegedly --

(May 5, 2009 Tr. 6:21-25, 7:1-16). At this point, the Court suggested that it was not in the

defendant's best interest to discuss the charged conduct in open court and directed Abdur

Rahman's attention back to the topic of representation, inquiring about Abdur Rahman's wishes

several times. The defendant indicated that he would prefer that a new attorney be appointed.

The Court appointed Kafahni Nkrumah, Esq. to be Abdur Rahman's second counsel. At the

defense's request, the Court also scheduled a hearing to address bail again.

> **2.      The Court Refuses to Replace Abdur Rahman's Second Attorney**

At the bail hearing on May 19, 2009, the Court addressed a letter from Abdur Rahman,

submitted after Mr. Nkrumah's appointment. In the letter, Abdur Rahman asked that Mr.

Nkrumah be replaced with a third attorney. Abdur Rahman contended that Mr. Nkrumah was not

experienced enough to represent him and request an attorney who was "older with the

experience."

The Court indicated that it was not inclined to immediately replace Abdur Rahman's

second attorney, stating that "this is not going to be a revolving door for counsel. You've had

two bites at the apple and you're not even giving Mr. Nkrumah a chance." The Court directed

defense counsel to consult with Abdur Rahman and communicate to the Court the status of their

relationship.

> **3.      Abdur Rahman Seeks to Proceed *Pro Se* Rather than Proceed with Nkrumah**

Almost immediately, Abdur Rahman submitted another letter attacking Mr. Nkrumah.

Dated May 28, 2009, the three-page letter stated that Abdur Rahman wished to represent himself

rather than have Nkrumah represent him. Discussing his Sixth Amendment request, the defendant stated:

> My reasons to exercise my Sixth Amendment rights are all within my best interest. Counsel Nkrumah's most recent performance was very inadequate, and inconsistent with the original planned arguments, I was surprised and lost; and, just to quote, "counsel Nkrumah, during my bail hearing, I think, prejudiced me more than the government initiated". Furtherance counsel Nkrumah has not at any time corresponded with me via writ in order to keep me informed and/or updated; and, in the same, counsel Nkrumah, heretofore, has not forwarded me any of the Discovery in which he alleges that he has, even upon rendering numerous requests. Now, I'm not versed with CJA payments, but there is reason to believe that counsel Nkrumah's main centricity is merely CJA payments, not inclined towards the matter-above; and I can understand counsel Nkrumah's position, due to the current recession we all may become victims.

In addition, Abdur Rahman contended that he had been promised immunity from prosecution and being prosecuted as a result of a personal vendetta. He alleged that the his prosecution was the result of "[FBI Special] Agent Hagan's vindictiveness towards me" and that the assigned prosecutor was "being used and influenced."

### 4.     Competency Proceedings

The Court promptly forwarded Abdur Rahman's letter to Mr. Nkrumah and scheduled a conference for June 8, 2009. At the conference, Mr. Nkrumah relayed Abdur Rahman's desire to represent himself, but also raised concerns about his competency:

> Your Honor, I have had an opportunity to overlook Mr. Rahman's letters to the court and also the opportunity to read the letters that he's also written to me. Mr. Rahman at this time is requesting permis- sion from the Court to represent himself and go pro se in this matter.
>
> Your Honor, based on the conversations that I — can I have one moment before I continue, Your Honor? . . .
>
> [Counsel conferred with Rahman] ....

> At this time, we would suggest to the Court, request from the Court
> permission to file a motion for a competency hearing for Mr.
> Rahman.

(June 8, 2009 Tr. 2:13-25; 3:1-2). Nkrumah did not the detail the attorney-client conversation or correspondence that he referenced as part of his reason for his request. The Government did not object to Mr. Nkrumah's request and indicated that the director of clinical psychology at Fordham University was prepared to conduct an evaluation the following week. The Court subsequently authorized the evaluation.

### 5.    During Competency Evaluation, Abdur Rahman Restates Desire for New Counsel

On July 24, 2009, Dr. Rosenfeld submitted his psych logical evaluation of the defendant to the Court. The evaluation was based, in part, upon Dr. Rosenfeld's interview of the defendant in the presence of defense counsel. (Competency Report ("Rep.") at 1). During the interview, Abdur Rahman was specifically advised "that the results of this evaluation would be made available to the court, the U.S. Attorney's Office and his attorney" and that "no information disclosed in the context of this evaluation could be considered confidential." (*Id.* at 1).

In a detailed discussion of his relationship with counsel relayed in the competency report, Abdur Rahman made clear that he would prefer a new attorney to proceeding *pro se*. Dr. Rosenfeld wrote that Abdur Rahman

> revealed considerable dissatisfaction with his attorney and
> indicated that if the judge was unwilling to provide a new attorney
> he would prefer to represent himself (*although he also
> acknowledged that he would prefer a new attorney, despite
> apparent over-confidence in his own abilities*).
>
> ….
>
> Although Mr. Rahman's refusal to continue working with his
> present attorney appears grounded in his personality disorder (e.g.,
> blaming his attorney for his continued incarceration and failure to
> challenge aspects of his current charges and claiming a 'conflict of

interest' because they may have met in the past, when Mr.
Nkrumah worked in a drug treatment program), he also understood
the disadvantages of self-representation (despite a grandiose belief
in his own abilities). More importantly, Mr. Rahman appeared
capable of working with an attorney (other than Mr Nkrumah) in
preparing a defense.

(*Id.* at 4-5 (emphasis added)).

While noting Abdur Rahman likely suffered certain mental conditions, including

"pronounced paranoid and grandiose beliefs" (*Id.* at 4), and had a history of psychiatric

hospitalizations, Dr. Rosenfeld concluded Abdur Rahman was competent to stand trial. He wrote

that Abdur Rahman "displayed a number of symptoms indicative of a personality disorder with

primarily Borderline and Antisocial features," and "revealed impulsive behavior and thinking,

paranoid ideation, and a grandiose sense of self-importance, and unstable interpersonal

relationships" (*id.* at 4), and that "his answers to questions were often tangential and rambling,

needing redirection in order to answer the questions asked" (*id.* at 3), but that Abdur Rahman

"appeared capable of understanding the charges against him and was capable of working with an

attorney in preparing his defense," as required for a competency finding (*Id.* at 5).

In its summary and recommendations, the report reiterated that Abdur Rahman's

preference was to proceed with new counsel, stating, in relevant part:

Despite [his] apparent personality disorder, and his refusal to continue working
with his attorney (which appears to be the product of his personality disorder),
Mr. Rahman appeared capable of understanding the charges and proceedings
against him and was capable of working with an attorney in preparing his defense.
*Although he expressed a desire for a new attorney*, Mr. Rahman also indicated his
willingness to represent himself and appeared to understand the disadvantages of
self-representation (despite a grandiose belief in his own abilities).

(*Id.* at 5 (emphasis added)).

### 6.   Abdur Rahman Restates Dissatisfaction with Mr. Nkrumah and Receives New Appointed Counsel

Abdur Rahman then submitted another letter to the Court expressing dissatisfaction with

Mr. Nkrumah, stating that he "has persistently perjured himself on all of his (counsel Nkrumah) uttered promises on the matter of assisting me with my case." Mr. Nkrumah filed a motion seeking to withdraw and be replaced with new counsel, stating that while he did not wish to disclose matters within the scope of the attorney-client privilege, "it is the belief of counsel that the attorney/client relationship between counsel and defendant is irreparably damaged."

At a conference to discuss Abdur Rahman's competency and representation, Mr. Nkrumah, who had been present during the evaluation when Abdur Rahman had stated his preference for a new attorney, requested that he be relieved and a new attorney appointed. The Court sought to ascertain Abdur Rahman's views directly:

> The Court:    All right. Mr. Rahman?
>
> Defendant:    Yes, sir, Judge.
>
> The Court:    Are you not able to get along with Mr. Nkrumah?
>
> Defendant:    Not one bit, your Honor.
>
> The Court:    Well, this is the second attorney who you couldn't get along with. Are you familiar with the game of baseball?
>
> Defendant:    Yes, sir, Judge.

(July 30, 2009 Tr. at 3:20-25; 4:1-3). The Court stated it would appoint a third attorney for the defendant, but that "like baseball, this is the third strike." Abdur Rahman voiced no objection to the Court' action.

**7.    Abdur Rahman Announces Satisfaction with New Counsel**

In the first conference following the appointment of Charles Hochbaum, Esq., as the defendant's third attorney, the Court found Abdur Rahman competent. During the conference, Abdur Rahman requested and was granted an opportunity to address the Court. He made the following statement:

Defendant:     I just wanted to apologize if I have inconvenienced the courts with the third appointment of counsel and I just want to inform you that I'm more than satisfied with him. He's the best.

The Court:     I am delighted to hear that, and what's past is past

Defendant:     Thank you.

After this point, Abdur Rahman made several *pro se* motions before and during trial. For instance, Abdur Rahman filed a *pro se* motion to dismiss the Indictment on grounds that the conduct alleged was a violation of state law but not federal law — an argument that counsel raised at trial. Abdur Rahman also filed a motion to recuse this Court due to alleged bias and prejudice, another motion to dismiss the Indictment, a *pro se* addendum to the counseled motion to suppress the defendant's statements and to dismiss the Indictment on the grounds that it was multiplicitous.

Through his attorney, on January 4, 2010, Abdur Rahman also made a request to serve as "co-counsel … or in the alternative to proceed as *pro se*." (Jan. 4, 2010 Tr. at 3:14). The Court denied the request, stating that there would not be "two voices" for the defendant. (*Id.* at 3). When the Court asked if there was anything else he needed to decide, neither Abdur Rahman nor Mr. Hochbaum raised anything further with respect to proceeding *pro se*. From that date forward, Abdur Rahman never again sought to dismiss his counsel or represent himself.

**C.      The Government's Case**

Trial began on January 4, 2010. The evidence against Abdur Rahman consisted of, *inter alia*, Abdur Rahman's own confessions, including signed statements; testimony from 18 witnesses, including pharmacy employees, medical professionals, and a Medicaid expert; as well as physical evidence recovered from Abdur Rahman's person, home, and vehicle. At the end of the one-week trial, a jury convicted Abdur Rahman of all four counts against him.

### 1.     Defendant's Confessions

Philip Schaffroth of the New York City Human Resources Administration, Bureau of Fraud Investigations ("BFI") testified about the defendant's detailed confessions of his fraud scheme. After the owner of Astoria Chemists, a Queens pharmacy, alerted the BFI to a high volume of suspicious prescriptions being filled by a customer—later identified as Abdur Rahman—agents established surveillance outside the pharmacy on March 5, 2009. After Abdur Rahman was observed leaving Astoria Chemists, investigators pulled Abdur Rahman over and questioned him. Abdur Rahman gave a detailed confession. He signed a written statement detailing his scheme.

The defendant met with Schaffroth on several additional dates, providing information about some of the buyers of fraudulently obtained drugs and reviewing prescriptions that investigators had obtained and identified those he had filled. Abdur Rahman signed an additional statement in which he described fraudulently obtaining drugs through Astoria Chemists and two pharmacies in the Bronx — Safeway Pharmacy and La Cross Pharmacy.

### 2.     Physical Evidence

Several law enforcement officers, including Schaffroth, testified about the physical evidence recovered from Abdur Rahman's person, apartment, and vehicle. Agents recovered several bottles of medication prescribed to others, including "Willie Smalls" and "Stanley Marshall," as well as pedigree information about Marshall; photocopies of Medicaid cards; documents that appeared to be records from the Bureau of Prisons; other documents bearing names of multiple people; and a written note stating: "My goal is: 14660 in one week."

### 3.     Witnesses

The jury also heard testimony from health officials, pharmacy employees, medical professionals, doctors whose prescriptions Abdur Rahman had forged, and others. A New York

State health official testified that Medicaid was funded by the county, state, and federal governments. Employees from three pharmacies testified how Abdur Rahman had filled multiple prescriptions at their places of business, including prescriptions for some names that corresponded to the physical evidence recovered from Abdur Rahman. Several medical professionals testified that Abdur Rahman had visited their offices, often posing as a Medicaid beneficiary recently released from prison, including under a name that was found on phony documents in Abdur Rahman's apartment.  Moreover, two doctors who had treated Abdur Rahman identified prescriptions he had filled as forgeries. A member of the special investigative section of the Bureau of Prisons also identified the purported Bureau of Prisons letters as fraudulent. A DEA chemist testified that some of the drugs recovered from Abdur Rahman contained controlled substances.

### 4. Loss Calculation

FBI Special Agent Eugene Hagan testified that, in total, Medicaid paid $487,570.92 to Astoria Chemsists for medications that Abdur Rahman obtained there, as well as a an additional $284,288.91 for medications Abdur Rahman obtained from Safeway and La Cross Pharmacies.

## D. The Defense Case

Abdur Rahman testified at trial as the sole defense witness. On direct examination, Abdur Rahman testified that he had been promised immunity from prosecution on the occasions when he met with Schaffroth and other state investigators, and that without those promises he would not have made statements to the agents or identified particular prescriptions as having been filled by him. He also testified that he had served as an informant for the FBI beginning in 2008. In addition, Abdur Rahman testified that while he had used Medicaid identification cards of others to get drugs, he had never stolen credit cards, and he argued that he had never committed a federal crime because Medicaid benefits were state, rather than federal, benefits.

On cross-examination, Abdur Rahman acknowledged that while he was an informant for the FBI, he had been warned that he was not authorized to break the law. In addition, he acknowledged that he had never been instructed by the FBI to forge prescriptions or use other people's Medicaid cards. Abdur Rahman also acknowledged that when he was stopped by agents on March 5, 2009, he was caught with drugs he had obtained in the name of another person — "Willie Smalls" — whom he had paid for Smalls's Medicaid information.

On January 11, 2010, the jury found Abdur Rahman guilty of all charges against him.

## E.    Post-Trial Proceedings and Sentencing

### 1.    Abdur Rahman Seeks and Receives a Fourth Attorney

Several months after trial, acting at Abdur Rahman's request, the District Court appointed a fourth attorney for the defendant, in light of a breakdown in relations between Abdur Rahman and Mr. Hochbaum. At a conference on March 19, 2010, Mr. Hochbaum noted that it would be impossible to continue as Abdur Rahman's counsel, but that he was unsure whether Abdur Rahman wished to proceed *pro se*. After some lengthy discussion in which Abdur Rahman listed his complaints with Hochbaum and began discussing the Sentencing Guidelines, the Court asked Abdur Rahman directly whether he wanted a new attorney.

The Court:   Do you want me to appoint another attorney?

Defendant[*]:   Yes, I would. Yes, sir, I would, because I'm just sick of – I'm stressed with the legwork that he's doing nothing and receiving the glorification—

(March 19, 2010 Tr. at 4:14-18). The Court appointed Stephanie Carvlin, Esq. as Abdur Rahman's fourth attorney. Abdur Rahman did not raise any other concerns regarding counsel at the conference.

---

[*] This statement is erroneously recorded as that of defense counsel in the transcript.

### 2.    Abdur Rahman Seeks and Receives a Fifth Attorney

Within two months, Abdur Rahman submitted a letter to the Court expressing his dissatisfaction with Ms. Carvlin and his desire to represent himself. At the June 1, 2010 conference to discuss the issue, Ms. Carvlin requested that Abdur Rahman be permitted to represent himself. When the Court asked Abdur Rahman directly whether he wished to proceed *pro se*, however, Abdur Rahman responded elliptically, answering the Court with complaints concerning Ms. Carvlin. In particular, when asked whether he wanted to represent himself, he began to discuss the arguments that he wanted Ms. Carvlin to raise. Although the Court inquired again, Abdur Rahman again declined to give a direct answer.

| | |
|---|---|
| The Court: | Do you want to represent yourself? Is that what you want to do in this case? |
| Defendant: | Ms. Carvlin won't adequately represent me. |
| The Court: | Do you want to represent yourself, yes or no? |
| Defendant: | If I represent myself, would you grant me a stay of the proceedings? |
| The Court: | No. |
| Defendant: | Why not? |
| The Court: | Because this matter's ready for sentencing. |
| Defendant: | But all four counts were multiplicitous. They were multiplicitous. |
| The Court: | I already heard you on that motion. |
| Defendant: | Congress has not authorized cumulative punishment arising out of health care fraud. They were multiplicitous, all four counts were. Why won't you grant me a stay of the proceedings? Because I have the notice, I have the notice that was filed with the appellate court. If there's no problem, Judge — |

(June 1, 2010 Tr. at 5:14-25; 6:1-5). After further discussion of defendant's legal arguments, the Court again redirected Abdur Rahman to the subject of counsel. Abdur Rahman steered his

answer to address other claims.

|             |                                                                                                                                                                                                                                                                                                                                                                                              |
|-------------|----------|
| The Court:  | Mr. Rahman, I'm really not going to continue this dialogue with you. I asked you a very simple question, and it was the purpose for this conference, because you told your lawyer that you wanted to represent yourself. |
| Defendant:  | Absolutely. |
| The Court:  | Now, I personally don't think that's a good decision, and I would suggest to you that you continue to allow Ms. Carvlin to represent you, but the question is a simple one because we have to move forward to sentencing. Do you want to represent yourself or not? |
| Defendant:  | Okay. So Judge, your Honor, sir, so let me understand this. My pro se motion for Rule 46, that's criminal procedure, that's my constitutional right. This Court is telling me that you have barred that from the United States District Courts, that my motion is not going to be entertained? Either the Court has to make a ruling, a ruling that's favorable or denying the motion. I am a United States citizen, I was born John F. Presley before I embraced Islam. I'm not from another country. That's my constitutional right. |

(*Id.* 6:25; 7:18).

After the Court addressed Abdur Rahman's motions, it again directed the defendant back to the question of representation. Only after being prompted three additional times did Abdur Rahman indicate that he wished to proceed *pro se*, immediately following his wish with a request for "hybrid standby counsel."

|             |                                                                                                                                                                                                                                                                                                                                                                                              |
|-------------|----------|
| The Court:  | What else? Are you going to answer my question? Do you want to represent yourself or not? |
| Defendant:  | I cannot allow her to represent me if she's not going to adequately represent me. |
| The Court:  | My question calls for a yes-or-no answer, sir. |
| Defendant:  | The government alleges that I de- frauded the New York State Welfare Benefit Program out of money, so by the time I'm finished with the ap- peal, it will be about ten times that much more on the taxpayers' money, if the Court feels that's applicable, if they feel as though that's correct to do. Everything has been |

denied, and in favor of the government.

| | |
|---|---|
| The Court: | Do you want to represent yourself— |
| Defendant: | Yes. |
| The Court: | —or not? |
| Defendant: | But I need a hybrid counsel. I need you to appoint somebody for hybrid standby counsel. |
| The Court: | Ms. Carvlin is your standby counsel. |
| Defendant: | I don't want her standing by. |

(*Id.* 8:21-25; 9:1-15). The Court allowed Abdur Rahman to proceed *pro se*. After setting deadlines and discussing the defendant's medical concerns, however, the Government requested and the Court engage in a *Faretta* colloquy concerning whether the defendant's waiver of his right to counsel was knowing and voluntary. The Court advised that "while you have the right to represent yourself, it's the Court that must decide for itself whether your waiver of your right to counsel is knowing, intelligent, and voluntary," and proceeded to ask Abdur Rahman a series of questions. In response, Abdur Rahman framed *pro se* representation as involuntary.

| | |
|---|---|
| The Court: | Do you understand that if you represent yourself in connection with the sentencing you will stand by yourself and the Court cannot give you advice? |
| Defendant: | I understand that, your Honor. I mean, I don't have a choice. I mean, I don't have a choice. |
| The Court: | You do have a choice, of course. |
| Defendant: | I don't have a choice. |
| The Court: | You have a highly competent attorney standing next to you. |
| Defendant: | How do I have a choice when you don't have legislative authority and you put health care fraud in 1028, in relation to health care fraud? There's no such thing mentioned in the statute, in none of the paragraphs. So this means it's a personal thing, that the Court has entertained the |

government's corruption. I mean, I don't have a choice . . .

(*Id.* at 21:2-16). The Court ultimately directed the defendant back to the *Faretta* inquiry,

advising the defendant that an attorney could better handle the remaining legal proceedings and

that "standby counsel cannot do everything for you; you have to stand and do for yourself. The

Court then turned to the topic of the defendant's right to effective assistance of counsel. In

response to the Court's questions, the defendant stated that he was unwilling to give up the

guarantee of effective assistance of counsel during the period in which he was representing

himself:

| The Court: | Now, given your desire to represent yourself, do you waive any ineffective assistance of counsel claims going forward? |
| --- | --- |
| Defendant: | No, I do not. |
| The Court: | Going forward in this case. |
| Defendant: | No, I do not waive them. |

(*Id.* 22:20-25). The Court concluded based on his statements that the defendant believed he

would retain his right to effective representation of counsel even while representing himself,

stating, "He thinks if he could appoint himself, as counsel, then be ineffective and argue on

appeal that he got ineffective assistance of counsel. It's perfect." (*Id.* 23:1-5). The District Court

stated that it would therefore not permit Abdur Rahman to represent himself.

After that conference, the defendant submitted a letter to the court advising, in part, that

he and Ms. Carvlin were no longer at odds. In particular, in a letter he submitted concerning

sentencing, he advised that "counsel Carvlin and I, I think now have a very great rapport, thank

you."

### 4.     The Sentence

On November 17, 2010, the Court sentenced Abdur Rahman to 101 months in prison.

The sentence consisted of 77-month concurrent sentences on Count One (defrauding Medicaid), Count Two (access device fraud), and Count Three (acquiring controlled substances), and a 24-month consecutive sentence on Count Four (aggravated identity theft). Abdur Rahman is currently serving his sentence.

## F.     Abdur Rahman's Direct Appeal

Abdur Rahman appealed his conviction, arguing that the Court denied his Sixth Amendment right to represent himself by appointing counsel despite his request to represent himself and despite his motion to proceed *pro se* at sentencing. In relation to his Sixth Amendment arguments, Abdur Rahman also contended that his second attorney, Mr. Nkrumah, rendered ineffective assistance of counsel in failing to press his request to represent himself. In addition, Abdur Rahman submitted a *pro se* motion with eight other issues for review, which the Court of Appeals addressed in a separate opinion. On February 15, 2013, the Second Circuit affirmed the District Court's judgment.

By summary order, the Second Circuit rejected each of Abdur Rahman's arguments and affirmed his conviction. *United States v. Abdur-Rahman*, 512 F. App'x 1, 3 (2d Cir. 2013) *cert. denied*, 134 S. Ct. 1018 (U.S. 2014). The Second Circuit held that Abdur Rahman was not denied his Sixth Amendment right to self-representation. *Id.* at 4. The Circuit reasoned that Abdur Rahman's request was not unequivocal. *Id*. at 4. ("Rahman's prior and unresolved motion for new counsel, coupled with his repeated complaints about Atty. Nkrumah and his expressed wish for substitute counsel, evinced a desire not to represent himself but instead to have the district court appoint new counsel."). Abdur Rahman's conviction became final on January 21, 2014, when the Supreme Court denied his petition for certiorari. *Rahman v. United States*, 134 S. Ct. 1018 (U.S. 2014).

**G.      Abdur Rahman's Present Motions**

Abdur Rahman filed two motions in the 09 Cr. 442 docket: one styled a "Motion in Ad Judicium Provocare" dated November 13, 2013 (the November Motion); and a "Motion for Vacation of Conviction" dated February 24, 2014 (the February Motion).

Abdur Rahman's November Motion seeks an *ad judicium provocare* decision, purportedly pursuant to Rules 47 and 52(b) of the Federal Rules of Criminal Procedure. Abdur Rahman argued that the District Court overlooked and failed to address his January 4, 2010 oral motion to proceed *pro se*, thereby denying him his Sixth Amendment right to represent himself as well as Due Process.  (Nov. Mot. at 1-3).

Abdur Rahman's February Motion further sought to vacate his conviction, purportedly pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  Abdur Rahman continued to argue that the Court's purported failure to address his request to represent himself violated the Sixth Amendment and the Due Process Clause. (Feb. Mot. at 5-6). Abdur Rahman further argued that the Court's erroneously failed to conduct a *Faretta* inquiry and that the alleged denial of his Sixth Amendment and Due Process rights resulted in prejudice in the form of Mr. Hochbaum's purportedly prejudicial trial conduct.  (*Id.* at 5-10).[†]

<b>ARGUMENT</b>

Abdur Rahman's arguments are untimely, waived, and incorrect on the merits.  First, to the extent Abdur Rahman seeks to proceed under Rule 33, his claim was filed long after the 14 days required by that rule.  Second, to the extent Abdur Rahman seeks to proceed pursuant to Title 28, United States Code, Sectio 2255, he failed to raise his Sixth Amendment and Due Process arguments regarding his January 4, 2010 request to proceed *pro se* on direct appeal,

---

[†] Though Abdur Rahman argues that Mr. Hochbaum's trial performance prejudiced Abdur Rahman, there is no claim that Mr. Hochman rendered constitutionally ineffective assistance of counsel.

despite raising similar Sixth Amendment arguments about this motions to proceed *pro se* submitted on other dates. Accordingly, Abdur Rahman waived his right to raise such arguments in a post-conviction motion. Second, even if Abdur Rahman had raised these arguments on appeal, which he did not, they lack any merit. As the Second Circuit has already found, Abdur Rahman's showed ambivalence and doubt about representing himself throughout the pretrial, trial, and post-trial proceedings. Since his request was not unequivocal, the District Court did not err.

**A.   Abdur Rahman's Motion Is Untimely Under Rule 33**

Abdur Rahman purports to bring his motion under Rule 33 of the Federal Rules of Criminal Procedure.  See generally Feb. Mot. The Rule provides, however, that a motion for a new trial must, except when based on newly discovered evidence, be brought within 14 days of the verdict or finding of guilty. *See* Rule 33(b)(2). Rahman was found guilty in January 2010 but did not bring his motion until, at the earliest, November 2013 and, accordingly, any Rule 33 motion is untimely and the motion should be denied.

**B.   Abdur Rahman Waived His Sixth Amendment and Due Process Arguments When He Failed to Properly Raise Them on Appeal**

**1.   Applicable Legal Standards**

"A motion under § 2255 is not a substitute for an appeal." *United States v. Munoz*, 143 F.3d 632, 637 (2d Cir. 1998). A claim (other than for ineffective assistance of counsel) may not be presented in a habeas petition where the petitioner failed to properly raise the claim on direct review. *Reed v. Farley*, 512 U.S. 339, 354 (1994); *Massaro v. United States*, 538 U.S. 500, 505-06 (2003). A claim not presented on direct appeal can only be raised if the petitioner establishes either (1) "cause" for failing to raise the issue and "actual prejudice" from the alleged violations; or (2) "actual innocence." *Bousley v. United States*, 523 U.S. 614, 622 (1998). The "cause and

prejudice" requirement applies to constitutional as well as non-constitutional claims. *Campo v. United States*, 968 F.2d 187, 190 (2d Cir. 1992).

> ### 2.     Discussion

If treated as a petition pursuant to Title 28, United States Code, Section 2255, Abdur Rahman's claim is barred because he could have, but did not, raise the claim on direct appeal. Indeed, Abdur Rahman argued on appeal that he was denied the opportunity to proceed *pro se* when he was appointed his second attorney, Mr. Nkrumah. He equally could have, but did not, argue that he was denied the opportunity to proceed *pro se* in connection with his eve-of-trial request concerning Mr. Hochbaum. Abdur Rahman has not made any showing of cause for his failure to raise the claim on direct appeal and, accordingly, the claim is waived and his motion should be denied.

## C.     Even if Abdur Rahman Had Not Waived His Arguments, They Lack Merit

> ### 1.     Applicable Legal Standards

A defendant has the right to represent himself only if he knowingly, voluntarily, and unambiguously relinquishes his right to counsel. Because "[t]he right to self-representation and the assistance of counsel are separate rights depicted on the opposite sides of the same Sixth Amendment coin," the exercise of the right to self-representation requires the relinquishment of another right. *United States* v. *Purnett*, 910 F.2d 51, 54 (2d Cir. 1990). Indeed, "courts indulge in every reasonable presumption against waiver" of the right to counsel. *Brewer* v. *Williams*, 430 U.S. 387, 404 (1977). "[I]n order to represent himself, the accused must 'knowingly and intelligently' forgo" the benefits of counsel. *Id.* (internal citation omitted); *see also United States* v. *Schmidt*, 105 F.3d 82, 88 (2d Cir. 1997).

The requirement that a defendant's waiver of the right to counsel be knowing and voluntary has several corollaries. First, in order to give up his right to counsel, a defendant "must

be found competent to waive that right intelligently." *United States* v. *Schmidt*, 105 F.3d at 88

(citing *Godinez* v. *Moran*, 509 U.S. 389, 396-400 (1993)). Thus, when questions concerning

competency have been raised, it is error for a district court to permit a defendant to proceed

without an attorney if the court has not made a preliminary determination as to competency.

"[L]ogically, the trial court cannot simultaneously question a defendant's mental competence to

stand trial and at one and the same time be convinced that the defendant has knowingly and

intelligently waived his right to counsel." *United States* v. *Purnett*, 910 F.2d at 55; *see also*

*United States* v. *Zedner*, 193 F.3d 562, 565 (2d Cir. 1999). Accordingly, "where a trial court has

sufficient cause to doubt the competency of a defendant to make a knowing and intelligent

waiver of the right to counsel . . . counsel must serve until the resolution of the competency

issue." *Purnett*, 910 F.2d at 56; *see also United States* v. *Morrison*, 153 F.3d 34, 47 (2d Cir.

1998).[‡]

　　　　Second, the right to self-representation attaches only if it is asserted "clearly and

unequivocally." *Faretta* v. *California*, 422 U.S. 806, 835 (1975). Unless a request to proceed *pro*

*se* "is unambiguous and unequivocal, a convicted defendant could have a colorable Sixth

Amendment appeal regardless of how the trial judge rules: if his request is denied, he will assert

the denial of his right to self-representation; if it is granted, he will assert the denial of his right to

counsel." *Williams* v. *Bartlett*, 44 F.3d 95, 100-01 (2d Cir. 1994).

　　　　Even if a defendant makes a clear request for self-representation, "the right to self-

representation may be waived through conduct indicating that one is vacillating on the issue or

has abandoned one's request altogether." *Bartlett*, 44 F.3d at 100 (citing *Brown* v. *Wainwright*,

---

[‡] The decisions of whether to order a competency evaluation and whether to hold a competency hearing each rest within the District Court's discretion. United States v. Vamos, 797 F.2d 1146, 1150 (2d Cir. 1986); United States v. Xiao Qin Zhou, 428 F.3d 361, 380 (2d Cir. 2005).

665 F.2d 607 (5th Cir. 1982)). To be sure, a defendant whose requests for self-representation

have already been clearly denied need not continually restate his request in order to preserve a

*Faretta* claim. *Wilson* v. *Walker*, 204 F.3d 33, 37 (2d. Cir 2000) (*per curiam*). But a defendant

who appears to "be vacillating on the issue" or to have abandoned his request before a district

court reaches a conclusive determination may be deemed to have waived his right to self-

representation. *Id.* at 37 ("[A] waiver may be found if it reasonably appears to the court that

defendant has abandoned his initial request to represent himself." (Internal citations omitted)).

Thus, in *Wilson*, when a court appointed replacement counsel for a defendant who had applied to

proceed *pro se*, and granted new counsel a week to review the *pro se* application, the defendant's

"failure to reassert his desire to proceed *pro se* constituted a waiver of his previously asserted

Sixth Amendment right." *Id.* at 38. In addition, if "a *pro se* defendant invites or agrees to any

substantial participation by counsel, subsequent appearances by counsel must be presumed to be

with the defendant's acquiescence, at least until the defendant expressly and unambiguously

renews his request that standby counsel be silenced." *McKaskle* v. *Wiggins*, 465 U.S. 168, 183

(1984); *see also United States* v. *Mills*, 895 F.2d 897, 903 (2d Cir. 1990) (waiver of *Faretta*

rights may be express or implied). In sum, a defendant has a right to proceed *pro se* only if his

application to discharge counsel "was clear and unequivocal" and "he did not thereafter waive

his right to self-representation by abandonment." *Williams*, 44 F.3d at 100.

>    2.    **Discussion**

>    Even if, arguendo, Abdur Rahman's claim were both timely and not waived, it would fail

on the merits. For much the same reasons the Second Circuit found Abdur Rahman's similar

claim unmeritorious on appeal, it is not meritorious here. First, he never unequivocally asserted

his desire to proceed *pro se* during trial, but rather made a conditional and equivocal assertion in

connection with his desire to be appointed "co-counsel." Moreover, Abdur Rahman continued

with Mr. Hochman as his counsel throughout trial, then sought replacement counsel for

sentencing, then sought replacement counsel again on appeal. Though Abdur Rahman has

consistently and repeatedly made independent *pro se* arguments and assertions, he never made an

unequivocal assertion of his interest in proceeding pro se for trial and the Court was within its

discretion in proceeding without a Faretta inquiry, especially in light of Abdur Rahman's already

demonstrated history of seeking replacement counsel and the findings of Dr. Rosenfeld in

connection with the competency proceedings.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court enter an

order denying Abdur Rahman's motion in its entirety.

Dated: June 11, 2014
　　　New York, New York

　　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　PREET BHARARA
　　　　　　　　　　　　　　　　　　United States Attorney for the
　　　　　　　　　　　　　　　　　　Southern District of New York

　　　　　　　　　　　By:　　　 _/s/ Michael D. Lockard_
　　　　　　　　　　　　　　　　　　Michael D. Lockard
　　　　　　　　　　　　　　　　　　Assistant United States Attorney
　　　　　　　　　　　　　　　　　　(212) 637-2193